**PITTSBURGH TERMINAL CORPORATION, a Pennsylvania Corporation, Plaintiff-Appellant,**

v.

**MID ALLEGHENY CORPORATION; Garth E. Griffith and Carl C. Hawk, as Directors of Mid Allegheny Corporation, Defendants-Appellees.**

**No. 86–1194.**

United States Court of Appeals, Fourth Circuit.

Argued Jan. 6, 1987.

Decided Oct. 23, 1987.

Ellen M. Doyle (Michael P. Malakoff; Berger, Kapetan, Malakoff & Meyers, Pittsburgh, Pa., Gerard R. Stowers; Bowles, McDavid, Graff & Love, Charleston, W.Va., on brief), for plaintiff-appellant.

Thomas Henry Gilpin (Huddleston, Bolen, Beatty, Porter & Copen, Huntington, W.Va., on brief), for defendants-appellees.

Before WIDENER and CHAPMAN, Circuit Judges, and SIMONS, Senior District Judge for the District of South Carolina, sitting by designation.

WIDENER, Circuit Judge:

The plaintiff in this action, Pittsburgh Terminal Corporation, appeals from the order of the district court dismissing its claim for lack of *in personam* jurisdiction over the defendants. We vacate and remand.[1]

The dispute in this case arose from the approval by defendant Mid Allegheny Corporation of a transaction through which Mid Allegheny exchanged its majority interest in Western Maryland Corporation for shares of CSX Corporation, Mid Allegheny's parent corporation, as part of a merger between Western Maryland and CSX Minerals,, Inc., another CSX subsidiary. Pittsburgh Terminal is a minority stockholder in Mid Allegheny, 99% of whose stock is held by CSX Resources, Inc., which in turn is a wholly-owned subsidiary of CSX. Pittsburgh Terminal alleges that the transaction in question was unfair to Mid Allegheny since it did not receive fair value for its controlling shares of Western Maryland and that the transaction was undertaken and approved solely for the benefit of CSX, not Mid Allegheny and its shareholders.

Pittsburgh Terminal initiated this stockholder derivative suit in the United States District Court for the Southern District of West Virginia against Mid Allegheny and two of its directors, Garth Griffith and Carl Hawk, who were also officers of CSX at the time of the disputed transaction.[2] Subject matter jurisdiction was based on diversity of citizenship. The district court dismissed the action as to Hawk and Griffith for lack of personal jurisdiction, holding that they had not established the requisite minimum purposeful contacts with West Virginia, so that the assertion of personal

jurisdiction over them by West Virginia in this case did not accord with due process. *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Subsequently, the court dismissed Mid Allegheny, since it had been named only as an indispensable party.

Both Hawk and Griffith are residents of the Commonwealth of Virginia, and are employed by CSX in the City of Richmond. At the time of the transaction, Hawk was Vice President and Corporate Secretary of CSX, and Vice President and Secretary of Mid Allegheny, CSX Minerals and CSX Resources; Griffith was General Counsel of CSX, Mid Allegheny and CSX Minerals. CSX, CSX Resources, and CSX Minerals all are Virginia corporations. Both were officers and directors of Western Maryland. Western Maryland is a Maryland corporation doing business in Maryland and West Virginia. Mid Allegheny, of which Hawk and Griffith were directors, is a West Virginia corporation doing business in West Virginia.

Defendants Hawk and Griffith, then, had at least the following contacts with the State of West Virginia: (1) they acted as directors of a West Virginia corporation which did business in West Virginia, (2) as directors of Western Maryland, they participated in the solicitation of the proxy of Mid Allegheny in favor of the merger, (3) as the directors of Mid Allegheny, they participated in voting the corporation's stock in favor of the challenged transaction, and (4) they approved the transaction through a telephone call to West Virginia with Mid Allegheny's director and president, a citizen of West Virginia. In addition, Hawk was the individual who actually voted Mid Allegheny's proxy in favor of the transaction. It is not alleged that either of the non-resident directors was ever physically present in West Virginia for any

---

1. As the district court indicated in its opinion, the record in this case leaves much to be desired.

2. PTC had filed an earlier action against Mid Allegheny, CSX, CSX Resources, CSX Minerals, Griffith, Hawk, and a third Mid Allegheny director, H. Preston Henshaw. Hawk and Grif-

fith obtained a dismissal in that case, however, on the ground that they had not been properly served. Rather than appeal, Pittsburgh Terminal commenced this second action against Hawk and Griffith. The dismissal in the first case is reported at 110 F.R.D. 4 (S.D.W.Va.1985).

purpose relating to the transaction. The question presented is whether, in the context of this litigation, the foregoing constituted the minimum purposeful contacts necessary to allow West Virginia to assert personal jurisdiction over Hawk and Griffith under West Virginia's long-arm statute.[3]

■ In the district court, the defendants attempted, as here, to invoke the "fiduciary shield" doctrine, under which "the acts of a corporate officer or employee taken in his corporate capacity within the jurisdiction generally do not form the predicate for jurisdiction over him in his individual capacity." *Bulova Watch Co. v. K. Hattori & Co.*, 508 F.Supp. 1322, 1347 (E.D.N.Y.1981). The district court, however, ruled that the doctrine was not available to Hawk and Griffith on the authority of *Columbia Briargate Co. v. First National Bank*, 713 F.2d 1052 (4th Cir.1983). *cert. denied sub nom, Pearson v. Columbia Briargate Co.*, 465 U.S. 1007, 104 S.Ct. 1001, 79 L.Ed.2d 233 (1984). There, this court held that the fiduciary shield doctrine is not available where the forum state's long-arm statute is "coextensive with the full reach of due process." 713 F.2d at 1064. Relying on *Harman v. Pauley*, 522 F.Supp. 1130 (S.D. W.Va.1981), the district court found that West Virginia's long-arm statute, W.Va. Code § 56–3–33, is coextensive with due process (which is not disputed by defendants), and refused to apply the doctrine. We agree with its analysis and affirm the district court's ruling on the fiduciary shield doctrine.

We next consider whether assertion of jurisdiction by West Virginia over Hawk and Griffith under the long-arm statute was proper and whether it satisfies the dictates of due process, i.e., whether the defendants established minimum purposeful contacts with the State of West Virginia.

■ Since *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), the Supreme Court has held that due process requires a State seeking to assert *in personam* jurisdiction over a non-resident to show that the non-resident defendant had established some meaningful contacts with the forum state. In demanding that persons have fair warning that their activities may subject them to suit in a particular State, the Fourteenth Amendment "gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurances as to where that conduct will and will not render them liable to suit." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980). These contacts are established where there has been "some act by which the defendant purposefully avails ... [himself] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958).

Furthermore, it is not necessary that the defendant ever actually enter the forum State's territory; so long as the defendant has purposefully directed his activities toward the forum State, and the litigation arises from those activities, due process is satisfied. See *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984). See also *McGee v. International Life Insurance Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957).

The Court has noted three reasons why a State should be able to assert jurisdiction over non-residents who purposefully direct their activities toward that State. First, a State has an obvious interest in providing a forum for its resident to redress injuries inflicted by non-residents. Second, it would be unfair not to allow jurisdiction where the defendant has derived benefits from the activities directed toward the fo-

---

3. As noted, the defendants solicited Mid Allegheny's proxy in their capacity as directors of Western Maryland. Plaintiff asserts that, as an alternative theory, we should allow jurisdiction because the proxy solicitation was directed toward a forum resident, Mid Allegheny. Because of our disposition of this case on the basis of the defendants' activities, we need not consider this argument.

rum State. Finally, modern methods of transportation and communication make it much less onerous now for a person to defend himself in a remote forum. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 473–74, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985).

Both sides have cited *Shaffer v. Heitner,* 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977), as supporting their position. Although some of the language in *Shaffer* would tend to deny jurisdiction in this case, we feel that *Shaffer* ultimately supports the plaintiff's theory. *Shaffer* involved a Delaware statute that allowed the in-state property of a non-resident defendant to be sequestered in order to coerce the defendant's personal appearance. The property could be sold to satisfy the plaintiff's demands if the defendant did not enter a general appearance, thus submitting himself to the jurisdiction of the Delaware courts. In that case, the stock owned by the directors of the defendant corporation in a stockholder's derivative suit was seized, pursuant to another Delaware statute which made Delaware the situs of all stock in Delaware corporations, regardless of where the shares were physically located. None of the activities leading to the lawsuit had occurred in Delaware.

The Supreme Court held that Delaware could not constitutionally assert jurisdiction over the defendants or their property under this scheme. The narrow holding of that case was a simple one: the minimum contacts rule of *International Shoe* would henceforth be applied to actions *in rem* and *quasi in rem,* as well as to actions *in personam.*[4] The dispute between the plaintiff and the defendants here is in how *Shaffer* applied the minimum contacts test to the facts of that case.

The Court held that mere ownership of stock in a corporation could not supply the necessary contacts to allow the chartering

State to assert jurisdiction. In so doing, the Court observed that actions against property are in reality actions against the interests of persons in that property. Since the litigation there was not related to the property, the only role played by the property was to bring the defendants before the court. The plaintiff, however, claimed that the defendants' positions as directors of a Delaware corporation provided sufficient contacts with Delaware. The Court held, however, that this mere fact did not form the predicate for jurisdiction over the defendants or their property, because Delaware law based its "... jurisdiction, not on appellants' status as corporate fiduciaries, but, rather, on the presence of property in the State." 433 U.S. at 214, 97 S.Ct. at 2585. The Court did *not* hold, however, that the acceptance and exercise of a directorship in a domestic corporation was an insufficient contact to allow jurisdiction. In fact, the implications of the Court's language suggest just the opposite. The defendants could not be brought before the Delaware courts on a directorship theory because the state law did not so provide.[5] As the court stated:

"Delaware law bases jurisdiction, not on appellants' status as corporate fiduciaries, but rather on the presence of their property in the State.... [A]s Heitner's failure to secure jurisdiction over seven of the defendants named in his complaint demonstrates, there is no necessary relationship between holding a position as a corporate fiduciary and owning stock or other interests in the corporation." 433 U.S. at 214, 97 S.Ct. at 2585.

In noting that the defendants had no reason to expect to be sued in Delaware, the Court contrasted the Delaware statute to those in States explicitly making directors amenable to suit. 433 U.S. at 216, 97 S.Ct. at 2586. Were such a statute

---

**4.** Describing the impact of *International Shoe* on the traditional territorial analysis of personal jurisdiction, see *Pennoyer v. Neff,* 95 U.S. (5 Otto) 714, 24 L.Ed. 565 (1878), the *Shaffer* court stated that "the relationship among the defendant, the forum, and the litigation, rather than the mutually exclusive sovereignty of the States

on which the rules of *Pennoyer* rest, became the central concern of the inquiry into personal jurisdiction." *Shaffer v. Heitner,* 433 U.S. at 204, 97 S.Ct. at 2579 (footnote omitted).

**5.** The Court did not consider in its opinion any Delaware long-arm statute.

constitutional,[6] as the Court implies, then it follows that the acceptance of a directorship constitutes minimum contacts in a derivative suit. The rest of the Court's discussion, then, must necessarily be concerned with the scope of the Delaware statute.

■ In fact, the defendants in this case concede that a State may constitutionally bring directors within the reach of its long-arm statute. However, they read *Shaffer* as requiring that a State explicitly provide that accepting a directorship in a domestic corporation would make the director amenable to suit there. We disagree. If the West Virginia long-arm statute brings these directors within its terms whether or not the word "director" is used, then they are within a West Virginia district court's jurisdiction under the rule given tacit, if not explicit, approval in *Shaffer*. We do not construe *Shaffer*, as do defendants, to require the word of art "director," or something similar, be used before the non-resident directors of a domestic corporation may be brought within its terms.[7]

■ Turning to the case at hand, we find that West Virginia law in general commits the affairs of the corporation to its board of directors:

> "The business and affairs of a corporation shall be managed by a board of directors except as may be otherwise provided in the articles of incorporation." W.Va.Code § 31–1–95.

Both Hawk and Griffith then, by West Virginia law, had the affairs of this corporation entrusted to them. The total number of directors of Mid Allegheny was either three or four, according to the briefs, so they had at least half the voting strength of the directors and no resolution could be passed over their opposition. Hawk had been a director of Mid Allegheny since 1981, Griffith apparently for some shorter period of time. They were also directors and among the principal officers of Western Maryland which solicited Mid Allegheny's proxy to vote its shares in favor of the proposed merger. Wherever the actual acts took place in soliciting the proxy or wherever the proxy was mailed from and to, it could have been given effect only in West Virginia by virtue of the laws of West Virginia under which Mid Allegheny operated. Both Hawk and Griffith as directors of Mid Allegheny voted as directors to vote the shares of Mid Allegheny in favor of the merger. They thus participated in that decision, which, although it may have been accomplished by telephone or by mail, could have been given effect only in the State of West Virginia by Mid Allegheny which was organized and operated only by virtue of the laws of West Virginia. The transaction was not a small one. It concerned over $30,000,000, and even if Mid Allegheny's share of that was only $20,000,000, if the Western Maryland stock in Mid Allegheny's hands was not the principal asset of Mid Allegheny, it assuredly was one of them. Indeed, Hawk was the individual who actually voted Mid Allegheny's shares in favor of the transaction. On these facts, it is hardly possible to say with reason that Hawk and Griffith were not "transacting any business" in the State of West Virginia. Each act which each of them took with respect to this transaction was given effect in West Virginia by virtue of West Virginia law just as surely as if they had been in the principal office of the corporation in West Virginia, present and voting in person. A case in point, on facts less favorable to plaintiff than those present here, is *Ellwein v. Sun–Rise, Inc.*, 295 Minn. 109, 203 N.W.2d 403 (1972). *Ellwein* was a stockholders' derivative suit against nine of its 21 directors "… because of the alleged conduct of the non-resident directors acting as directors," 203 N.W.2d at 405. The court held, under a long-arm statute which gave jurisdiction over persons who "transact any business in the state," that the directors' authorization

---

6. At least one court has expressly ruled that such statutes are not unconstitutional. See *Stearn v. Malloy*, 89 F.R.D. 421 (E.D.Wisc.1981).

7. The part of the West Virginia statute with which we are immediately concerned is West Virginia Code § 56–3–33(a)(1) which confers jurisdiction over non-residents who are: "transacting any business in this State."

of the issuance of stock for a consideration unfair to existing stockholders was transacting business within the meaning of the statute. It reasoned that the fact that the directors may never have entered the State was not decisive nor was it vital that plaintiff be a resident to claim the benefit of the long-arm statute. It pointed out that Minnesota was the most convenient forum and that if the suit could not be brought within the Minnesota jurisdiction, then it might well be necessary for the plaintiffs to file suit in each jurisdiction in which personal service of process could be obtained on a director. A similar result obtained in the case of *Indian Lake Club v. Hainsworth*, 212 So.2d 915 (D.C.A. Fla. 1968), but the opinion in that case does not give us the precise words of the statute construed, and in *Lawson v. Baltimore Paint and Chemical Corporation*, 298 F.Supp. 373 (D.Md.1969). *Lawson* was on not dissimilar facts as exist here but was decided under the tort section of the Maryland long-arm statute providing jurisdiction for wrongs committed outside of Maryland to take effect in Maryland on account of services used in Maryland.[8] We thus conclude that the acts of Hawk and Griffith amounted to "transacting any business" under the West Virginia long-arm statute.

Excellent reasons exist for allowing a State to assert jurisdiction over non-resident directors of domestic corporations. A chartering State has a strong, even compelling, interest in providing a forum for redressing harm done by corporate fiduciaries,[9] harm endured principally by a resident of that State, the corporation. Unlike *Shaffer*, this is not a case where the corporation is a phantom resident of the chartering State. Although Hawk and Griffith, as directors, live in contiguous Virginia, Mid Allegheny apparently does business only in West Virginia, and its president lives and maintains his office in West Virginia. Given the high degree of regulation over corporate fiduciaries, the State's interest in providing a convenient forum for a derivative suit charging misfeasance or nonfeasance of a director cannot be overemphasized.

Such a rule also makes practical sense in that West Virginia law will apply to this cause of action. *Burks v. Lasker*, 441 U.S. 471, 478, 99 S.Ct. 1831, 1837, 60 L.Ed.2d 404 (1979). While the Court has stated that choice-of-law considerations are not conclusive as to jurisdiction, see *Shaffer*, 433 U.S. at 215, 92 S.Ct. at 2585, they should nevertheless carry some weight, and we consider that fact in arriving at our decision.

An assertion of jurisdiction such as this one should not come as any surprise. The

---

**8.** In any event, the case of *Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), decided the same day as *Keeton*, did away with any uncertainty about minimum contacts on a tort theory. There, a California plaintiff had sued in libel an editor and reporter of a national publication, published in Florida, which was circulated in California. California's long-arm statute provided that its courts might exercise jurisdiction on any basis not inconsistent of the Constitution of California or of the United States. The Court affirmed the California court which had held that the fact the acts were performed outside of California did not prevent California from asserting jurisdiction. It also held that "jurisdiction over petitioners is therefore proper in California based on the 'effects' of their Florida conduct in California." 465 U.S. at 789, 104 S.Ct. at 1486–87. We mention *Calder* because it is consistent with *Lawson* mentioned in the body of the opinion. While the parties are not in agreement as to whether or not the plaintiffs may depend on the tort section of the West Virginia long-arm statute

which provides for jurisdiction for "tortious injury in this State by an act or omission outside this State," it seems that *Calder* has settled that question so far as minimum contacts are concerned. Although the allegations in the complaint before us are little, if anything, less than a charge of fraud in polite language, we do not decide the question of whether the plaintiffs may depend on the tort section of the West Virginia statute because we think that the defendants are properly within the jurisdiction of the court on the grounds mentioned in the body of the opinion. See also *Duke v. Young*, 496 So.2d 37 (Ala.1986).

**9.** "[T]he chartering State has an unusually powerful interest in insuring the availability of a convenient forum for litigating claims involving a possible multiplicity of defendant fiduciaries and for vindicating the State's substantive policies regarding the management of its domestic corporations." *Shaffer v. Heitner*, 433 U.S. at 222, 97 S.Ct. at 2589 (Brennan, J., concurring and dissenting).

"insistent" interest of New York in closing trusts existing "by the grace of its laws" was sufficient to "establish beyond doubt the right of its courts" to ascertain the interests of all claimants, resident or non-resident, subject to the opportunity to appear and be heard. *Mullane v. Central Hanover Bank,* 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950). Moreover, the defendant in the recent case of *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), had demonstrably fewer ties with the forum state than the defendants here, yet jurisdiction was held proper. In *Burger King,* the defendant was found to be amenable to process in Florida on the basis of a franchise agreement entered into with a Florida corporation, even though nearly all of the defendant's dealings were with Michigan agents of Burger King, no part of the defendant's performance was to take place in Florida, and the defendant did not enter Florida (although his partner did). The Court found, however, that the defendant had "purposefully availed" himself of the privilege of doing business in Florida by creating "continuing obligations between himself and residents of the forum...." 471 U.S. at 476, 105 S.Ct. at 2184. See also *Travelers Health Association v. Virginia,* 339 U.S. 643, 647, 70 S.Ct. 927, 929, 94 L.Ed. 1154 (1950). Certainly, a director of a corporation has created a continuing obligation between himself and the corporation, one which inures significantly to the director's benefit, not to mention that of the corporation. Directors reap the advantages and protections available to them under state law, and it is not unfair to require them to answer for any alleged breaches of trust as a director in the forum that has bestowed those protections. No one forced or tricked the defendants into assuming their positions, and it seems clear that Hawk and Griffith have purposefully availed themselves of the privilege of doing business as directors under West Virginia's laws.

█ Our inquiry does not end with the conclusion that the defendants here have the necessary contacts with West Virginia to satisfy due process, however.

Once it has been decided that a defendant purposefully established minimum contacts within the forum state, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with "fair play and substantial justice." Thus courts in "appropriate case[s]" may evaluate "the burden on the defendant", "the forum state's interest in adjudicating the dispute", "the plaintiff's interest in obtaining convenient and effective relief", "the interstate judicial system's interest in obtaining the most efficient resolution of controversies", and the "shared interest of the several States in furthering fundamental substantive social policies". Those considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required. On the other hand, where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.

*Burger King,* 462 U.S. at 476–77, 105 S.Ct. at 2184–85 (citations omitted).

Hawk and Griffith argue that, even in the presence of the constitutionally required contacts with West Virginia, these "other factors" make the assertion of jurisdiction unreasonable in this case. To the contrary, we feel that, if anything, these factors make the assertion of jurisdiction more reasonable. Certainly the burden on the defendants of litigating in West Virginia is *de minimis.* Defendants, after all, reside in the bordering Commonwealth of Virginia. On the other hand, the plaintiff has a strong interest in having this case heard in West Virginia, since the record does not even show that suit could be maintained over Mid Allegheny in Virginia. Finally, as already noted, West Virginia has a strong interest in providing a forum for a claim such as this, where the directors of one of its domestic corporations are alleged to have committed wrongful acts in the

execution of their duties as directors and to the detriment of their corporation. Although the State has not drafted a statute specifically articulating this interest, see *Shaffer v. Heitner*, 433 U.S. at 214, 97 S.Ct. at 2585, the activities of the defendants are within the terms of the West Virginia long-arm statute. Additionally, this interest may be fairly implied from the significant duties imposed upon corporate fiduciaries, especially where the corporation is not only chartered by the State but apparently conducts all its business there. All things considered, we hardly think that the defendants have presented the "compelling case" required to defeat an otherwise proper exercise of jurisdiction.

■ The end point in any due process analysis of jurisdictional contacts is one of fundamental fairness: are the defendants' contacts with the forum state significant enough that assertion of jurisdiction over the defendant comports with traditional notions of fair play and substantial justice? We hold that, by accepting and exercising directorships of this West Virginia corporation, whose place of business is in West Virginia, and, by their various acts with respect to this transaction, the defendants established sufficient contacts so that they should have reasonably expected to be sued in West Virginia's courts to defend any actions regarding their conduct as directors. This is not a random or fortuitous exercise of jurisdiction, and we have no problem in holding that, by accepting and exercising directorships with Mid Allegheny, the defendants purposefully invoked the benefits and protections of West Virginia law. Of course, it may be something of a fiction to say that a corporation is a resident of the chartering State. Nevertheless, "[i]n many respects ... the law acts as if State chartering of a corporation has meaning." *Shaffer v. Heitner*, 433 U.S. at 226, n. 4, 97 S.Ct. at 2591, n. 4 (Brennan, J., concurring and dissenting). For purposes of diversity jurisdiction, a corporation is considered a citizen of the chartering State, as well as the State of its principal place of business. See 28 U.S.C. § 1332(c). Indeed, the entire structure of basic corporate law is built upon a series of fictions, most notably the fiction that a corporation is something that really exists, rather than being merely a creature of state law described on papers filed with the State. Directors and officers derive many benefits from the legal fiction of the corporation. It does not seem unfair to require them in turn to shoulder one of the few burdens of such a fiction. The defendants had full knowledge that Mid Allegheny was a West Virginia corporation when they accepted and exercised directorships. And, accepting a directorship is not a frivolous business. The law imposes substantial responsibilities, and substantial liability, upon corporate directors. Therefore, it seems perfectly reasonable to require defendants Hawk and Griffith to defend this action, concerning their conduct as directors, in a West Virginia court.

The order of the district court dismissing Hawk and Griffith for lack of personal jurisdiction must be vacated. Since Mid Allegheny was dismissed as an indispensable party in this suit, the order dismissing it also must be vacated. The case is remanded to the district court for proceedings consistent with this opinion.

VACATED AND REMANDED.