*Gary W. Stisser, et al. v. SP Bancorp, Inc., et al.*, No. 1790, Sept. Term, 2015

Opinion by Leahy, J.

## HEADNOTES

**Courts > Personal Jurisdiction > General Jurisdiction**

A nonresident parent corporation cannot be said to be "at home" in Maryland, and therefore subject to general jurisdiction in the State, based solely on its incorporation of a merger subsidiary within Maryland.

**Courts > Personal Jurisdiction > Specific Jurisdiction**

We do not say that the act of forming a subsidiary in Maryland cannot subject a parent company to personal jurisdiction in Maryland, but "[t]he quality and quantity of contacts required to support the exercise of personal jurisdiction will depend upon the nature of the action brought and the nexus of the contacts to the subject matter of the action." *Sleph v. Radtke*, 76 Md. App. 418, 428 (1988).

**Courts > Personal Jurisdiction > Specific Jurisdiction**

A nonresident parent corporation's formation of a merger subsidiary in Maryland, does not exhibit the parent's intent to establish continuing obligations in Maryland where the merger subsidiary was not intended to do business in Maryland and nothing about the formation of the subsidiary was directed at residents of Maryland.

**Courts > Personal Jurisdiction > Specific Jurisdiction**

It is not the mere filing of an instrument that gives rise to specific jurisdiction, but the execution of an instrument that is fraudulent or causes a tortious injury within Maryland—particularly when the instrument is, at best, only tangentially related to the plaintiff's claim.

**Courts > Personal Jurisdiction > Specific Jurisdiction**

To impute to a nonresident parent corporation the *specific* jurisdictional contacts of its subsidiary (absent a showing of fraud or a clear disregard of the corporate fiction) would run counter to the Supreme Court's holdings in *Daimler AG v. Bauman*, 134 S. Ct. 746, 759-60 (2014); *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 929 (2011); and *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295-99 (1980).

**Courts > Personal Jurisdiction > Specific Jurisdiction > Corporate Directors**

Absent a director-consent statute, it would violate the due process rights of nonresident corporate directors to subject them to personal jurisdiction in Maryland based solely on

their directorship in a company that, although incorporated in Maryland, was headquartered in out of state and conducted all of its business outside Maryland.

**Courts > Personal Jurisdiction > Specific Jurisdiction > Corporate Directors**

Nonresident corporate directors who never enter Maryland in connection with corporate business do not purposefully avail themselves of the privileges and protections of Maryland law by directing corporate activity outside of the state, even when the corporation files a legal document in Maryland, if the cause of action does not arise out of that document's filing and there is no reason to impute to the individual directors the corporation's act of filing that document.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1790

September Term, 2015

---

GARY W. STISSER, *et al.*

v.

SP BANCORP, INC., *et al.*

---

Woodward, C.J.,
Leahy,
Reed,

JJ.

---

Opinion by Leahy, J.

---

Filed: November 29, 2017

This appeal concerns Maryland's power to exercise personal jurisdiction over a company headquartered in Texas, as well as the out-of-state directors of another company that was incorporated in Maryland and headquartered in Texas. All relevant activity leading to the merger of companies challenged in the underlying shareholder action occurred outside Maryland except one: the incorporation of a transitory merger subsidiary.

Gary W. Stisser and Fundamental Partners ("Appellants") are not residents of Maryland, but they owned shares of common stock in SP Bancorp, Inc. ("SP"), which was a company headquartered in Texas and incorporated in Maryland. They filed a shareholder class action in the Circuit Court for Baltimore City following the merger of SP into a newly formed subsidiary of Green Bancorp, Inc. ("Green")—a bank holding company incorporated under Texas law with its principal place of business in Texas.

Appellants filed the lawsuit against SP and the individual members of SP's Board of Directors ("SP Directors") (collectively, the "SP Defendants"), and against Green and Green's newly-formed Maryland subsidiary, Searchlight Merger Sub, Inc. ("Searchlight") (collectively, the "Green Defendants").[1] Appellants' primary contention was that the SP Directors breached their fiduciary duty, aided and abetted by Green, in contriving the merger to advance their interests at the shareholders' expense. The circuit court granted motions to dismiss filed by the SP Defendants and the Green Defendants (together as "Appellees"), finding that the court lacked personal jurisdiction over the SP Directors and Green, and that, although the court had jurisdiction over SP and Searchlight, Appellants

---

[1] The underlying action also included a claim against Commerce Street Capital, LLC, which the circuit court dismissed with prejudice and which is not part of this appeal.

failed to state a claim against them.

Appellants noted an appeal to this Court presenting four questions, which we have rephrased as follows:[2]

1. By forming Searchlight in Maryland for the purpose of consummating a merger, did Green subject itself to personal jurisdiction in Maryland?

2. Are the SP Directors subject to personal jurisdiction in Maryland because the Articles of Merger were filed in Maryland?

3. Were SP and Searchlight necessary parties under Maryland Rule 2-211(a)?

4. Does the Complaint state a claim for relief against each of the Appellees?

We hold that Green was not subject to specific jurisdiction in Maryland because (1)

---

[2] The questions as presented by Appellants were:

1. "Did the circuit court err in holding that Green's formation of Searchlight, a Maryland corporation, for the sole purpose of consummating a merger with another Maryland corporation in Maryland, did not constitute a 'transaction of business' in Maryland for the purposes of Maryland's long-arm statute?"

2. "Did the circuit court err in holding that the non-resident directors of SP, a Maryland corporation, did not transact business in Maryland for the purpose of the Maryland long-arm statute when they caused the merger to be consummated in Maryland with the filing of articles of merger in Maryland?"

3. "Did the circuit court err in dismissing SP and Searchlight given that each is a party to the merger agreement, the Complaint seeks rescission of the merger, and Md. Rule 2-211(a) requires joinder of all necessary parties?"

4. "Does the Complaint state a claim for relief against each of the Defendants such that the Court may not affirm the decision of the Circuit Court on the alternate ground raised by the Defendants, but not decided by the Circuit Court, that the Complaint fails to state a claim for relief?"

2

the quality and quantity of its contacts in Maryland in relation to the merger did not rise to the level of "transacting any business" in Maryland within the meaning of Maryland's long-arm statute; and (2) Maryland's exercise of jurisdiction would not comport with traditional notions of due process under *International Shoe Co. v. Washington*, 326 U.S. 310 (1945), given Green's limited and attenuated contacts in Maryland. In accordance with the Supreme Court's recent decisions delimiting the authority of state courts to exercise general jurisdiction over nonresident corporations and corporate directors, we also conclude Green was not "at home" in Maryland for purposes of general personal jurisdiction. *Bristol Myers Squibb Co. v. Superior Ct. of Cal, S.F. Cty.*, 137 S. Ct. 1773 (2017) [hereinafter "*Bristol-Myers*"]; *BNSF Ry. Co. v. Tyrell*, 137 S. Ct. 1549 (2017); *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014); *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915 (2011). Consistent with *Daimler*, we hold that a nonresident parent corporation is not subject to general jurisdiction in Maryland based solely on its incorporation of a subsidiary within Maryland. We also decline to impute SP's contacts to its directors, and hold that the SP Directors—all nonresidents who never entered Maryland in connection with SP business—did not purposefully avail themselves of the privileges and protections of Maryland law.

In light of these holdings, we do not reach Appellants' third and fourth questions.

## BACKGROUND

Back in October 2010, SP converted its business structure from a mutually-owned thrift to a stock-based ownership bank holding company. This conversion triggered federal

3

regulations prohibiting the sale of SP for the next three years.[3] SP was incorporated in Maryland and served as the holding company and parent of SharePlus Bank, a Texas-chartered state bank. SP's principal place of business was in Texas, and the company did not have any offices or employees in Maryland. Indeed, according to the record on appeal, none of the SP Directors resided or were employed in Maryland.

By mid-2012, the SP Directors began entertaining the idea of a possible merger with Green. On August 2, 2012, Mr. Jeffrey L. Weaver, SP's President, and Mr. Paul M. Zmigrosky, the Chairman of SP's Board of Directors, met in Dallas, Texas with representatives from Green, "during which the representatives of Green initiated a high level discussion of a potential reverse merger with SP Bancorp following expiration of the three year restriction."

### A. Preliminary Negotiations

In July of 2013, SP hired Commerce Street Capital ("CSC"), an investment banking firm, to help find potential candidates to merge with SP. The next month, representatives from SP and Green met again in Texas to discuss a potential merger. On September 14, 2013, CSC presented SP with an analysis of a merger of equals, using Green as the basis

---

[3] 12 C.F.R. § 563b.525 (2012) stated, in pertinent part:

(a) For three years after [a converting bank] convert[s], no person may, directly or indirectly, acquire or offer to acquire the beneficial ownership of more than ten percent of any class of [the converting bank's] equity security without [the Office of Thrift Supervision's] prior written approval. . . .
(b) . . . [A]n offer is made when it is communicated. An offer does not include non-binding expressions of understanding or letters of intent regarding the terms of a potential acquisition.

for a merger partner. At this presentation, CSC advised the SP Directors on different growth strategies, including the purchase of a smaller financial institution, a merger of equals, or acquisition by a larger financial institution. Over the next few months, Mr. Zmigrosky and Mr. Weaver held preliminary discussions with several candidates, including a larger bank that the parties referred to as "Party A."

On January 9, 2014, from its headquarters in Texas, Green submitted a letter of intent to purchase SP for $43 million, representing approximately $25.91 per share. In the letter, Green proposed retention agreements for certain members of SP's senior management and non-compete covenants for the remaining SP Directors. The SP Directors met the next day at their headquarters in Texas to discuss Green's offer as well as the preliminary negotiations with Party A. At the meeting, the SP Directors decided to form a mergers and acquisitions subcommittee ("Committee"), composed of Chairman Zmigrosky and Directors Carl Forsythe, P. Stan Keith, and Jeff Williams. The Committee, in part, served to shield Mr. Weaver from merger negotiations due to the concern that, as President, Mr. Weaver was likely to be offered continued employment post-merger.

Throughout February, the Committee negotiated with and considered offers from Party A and a third entity. The most valuable offer came from Party A for approximately $23.78 per share comprised of cash and Party A stock. After learning of Party A's offer, Green revised its own offer, and increased the original offer price by approximately 21%. Ultimately, the Committee determined that Green's second offer was the best option, and on February 27, 2014, the Committee recommended that the full board of SP Directors accept Green's offer. In response, the SP Directors instructed the Committee to terminate

5

negotiations with Party A and execute Green's non-binding letter of intent.

**B. SP and Green Negotiate the Merger**

Green and SP, through outside counsel, continued negotiations and conducted due diligence in Texas and in New York over the course of the next month. Then, on March 28, 2014, Mr. Weaver met with representatives from Green in Dallas to discuss the possibility of his post-merger employment with Green. Three days later, CSC disclosed to SP that it owned a 3% share in Green. The Committee met with its legal counsel to discuss CSC's potential conflict of interest and determined that CSC had no existing commercial relationship with Green but, to avoid any potential impropriety, the Committee decided to engage Mercer Capital Management, Inc. as an independent advisor to render a fairness opinion on the merger.

On April 24, 2014, the SP Directors met with counsel, CSC, and Mercer to discuss Green's proposal. At this meeting, Mercer offered its preliminary conclusions from its fairness inquiry, indicating a "strong comfort level" that the merger met or exceeded SP's fair market value. Then, on May 1 and 5, 2014, the SP Directors met in Texas with legal counsel and the two financial advising firms to consider the merger. On May 1, the Committee provided the SP Directors with their recommendation to approve the merger. On May 5, Mercer issued its opinion that the merger was fair. Using multiple measures, Mercer valued SP in a range between $16.20 and $32.05 per share. Green's final proposed offer would pay $29.55 per share, which put the purchase price in the 96th percentile of Mercer's valuation—a 24.26% increase from Green's initial offer and approximately 40% over the price at which SP's shares closed the day prior. This 40% difference between

6

purchase price and market price of the shares represented the approximate cash payout for shareholders.[4]  Mercer concluded that the merger with Green was "fair, from a financial point of view, to [SP's] shareholders."  At the meeting's conclusion, on May 5, the SP Directors voted unanimously to approve the merger agreement.

SP announced the merger agreement that same day and set August 15, 2014, as the record date for its special meeting, at which point then-current owners of SP common stock would be entitled to a vote at the special meeting.  The special meeting, scheduled for October 8, 2014, in Plano, Texas, required a quorum of eligible voters, in person or by proxy, representing a majority of SP's 1,602,313 outstanding shares of common stock.  Of those voting shareholders, the merger agreement required a bare majority for its approval.

### C. Shareholders Institute a Class Action

Following SP's announcement, Mr. Stisser and Fundamental Partners filed class actions on June 10 and 12, 2014, respectively, on their own behalf and on behalf of those similarly situated, against the Appellees and CSC in the Circuit Court for Baltimore City.[5]  The circuit court thereafter granted the Appellants joint motion to consolidate their claims into a single action.

On August 25, 2014, SP filed its definitive proxy statement with the Securities Exchange Commission ("SEC") pursuant to Section 14(a) of the Securities Exchange Act

---

[4]  The SP Directors and executive officers owned 12.3% of the outstanding shares, with Mr. Weaver, himself, owning 1.9% (29,726 shares).

[5]  The underlying complaint does not state where Mr. Stisser resides or where Fundamental Partners is located.  The docket in case No. 21-C-14-003610, filed by Mr. Stisser, lists his mailing address at a location in "Boston, NY."

7

of 1934, and sent copies of the statement from Texas to its shareholders, informing them it would hold a special shareholder meeting in Texas. Just over two weeks later, on September 10, the Appellants filed a motion for preliminary injunction in Baltimore, asking the circuit court to enjoin the merger. Meanwhile, in Texas, Green offered Mr. Weaver a position post-merger.

On October 3, 2014, SP filed a supplement to its original proxy, which it sent to the SEC and all shareholders. The supplement disclosed, among other things, that in 2013, SP "sold certain market rate loans made by SP [] to certain of its directors and officers to Green." It also explained that, as early as March 28, 2014, Green's President and CEO, Mr. Geoffrey D. Greenwade, expressed his intention to employ Mr. Weaver post-merger. For this reason, the supplement explained, Mr. Weaver "was expressly excluded" from the Committee. Additionally, it disclosed the basis and methodology of Mercer's fairness opinion, including the factors Mercer considered in predicting SP's potential growth rate. Additionally, it explained the basis of the approximately 21% increase in Green's proposal, that Party A had expressed difficulty competing with a cash offer, and that Party A's second offer was "substantially equivalent to [its] prior proposal." Accordingly, the Committee believed Party A's offer would be "economically dilutive to [SP] stockholders and subject to significant execution risk[,]" and the Committee broke off negotiations with Party A because Green's offer "presented more value to [SP] stockholders[.]" SP postponed its special shareholder meeting from October 8 to October 15 "in order to provide stockholders with additional time to consider the supplemental disclosures."

Back in Maryland, three days after SP supplemented its proxy statement, the circuit

8

court held a conference call with the parties to discuss the status of the Appellants' motion for preliminary injunction. Following that call, Appellants sent the court a letter stating that they believed their claims were still viable, but conceding that it would "be difficult, if not impossible to demonstrate the requisite irreparable harm and balancing of the equities[]" necessary to support a preliminary injunction. Consequently, Appellants asked the court to remove the next day's oral argument from the court calendar.

SP convened its special meeting in Texas on October 15, 2014, and 99.5% of the SP shareholders who voted cast their votes in favor of the merger, with 75.8% of the total outstanding shares voting in favor of the merger. SP, along with Searchlight, Green's newly formed subsidiary in Maryland, filed articles of merger with the Maryland State Department of Assessments and Taxation on October 17, 2014 ("Articles of Merger").[6] As explained in the proxy statement,

> Searchlight Merger Sub Corp., a wholly owned subsidiary of Green, [was] a newly formed Maryland corporation created solely for the purpose of engaging in the transactions contemplated by the merger agreement and ha[d] not carried on any activities other than in connection with the merger. The address of the Merger Sub [wa]s 4000 Greenbriar St., Houston, Texas[.]

When SP and Searchlight effected the merger, Searchlight merged into and was subsumed by SP.

### D. The Underlying Complaint

On November 7, 2014, Appellants filed an amended consolidated complaint ("Complaint") in the Circuit Court for Baltimore City. The Complaint stated that the circuit

---

[6] SP's Articles of Incorporation did not provide dissenting shareholders with appraisal rights.

9

court had jurisdiction over each SP Director for the following reasons:

> (a) [each Director] created continuing obligations invoking the benefits and protections of Maryland law between [himself/herself] and SP Bancorp, which was incorporated in, and hence a resident of, this State at the time of the actions challenged herein; and (b) [each Director's] improper conduct alleged in this Complaint occurred in substantial part, was directed at, intended to have its primary effect in, and/or culminated in purposeful actions in, this State.

The Complaint alleged that collectively, the SP Directors,

> acting deliberately, dishonestly, breached their fiduciary duties to SP Bancorp's public shareholders by acting to cause or facilitate the [Merger] Agreement[.] . . . The [Merger] Agreement was not in the best interests of SP Bancorp's shareholders, but was, and is, in the best interests of the Individual Defendants. This is particularly true of Mr. Weaver, who received significant personal profits as a result of the [Merger] Agreement and fully expected to be employed by the surviving company following consummation of the [Merger] Agreement.

The Complaint also asserted that to "exert influence" over the SP Directors, Green purchased SP's outstanding loans to Directors Williams, Forsythe, and Cozby during the summer of 2013. Additionally, Appellants suggested that the SP Directors were self-interested in the merger agreement because it entitled them to cash payments for unvested stock options as well as a "change in control" severance payment.

Counts I - III alleged that the SP Directors breached their fiduciary duties; aided and abetted Mr. Weaver's breaches of loyalty, fair dealing, and due care;[7] and breached their duty to disclose all material facts in the proxy statement. In Count IV, Appellants alleged

---

[7] Count II was against the SP Directors other than Mr. Weaver, alleging that, "[b]y reason of the foregoing, the Individual Defendants, other than Mr. Weaver, have deliberately, actively and dishonestly aided and abetted Defendant Weaver in his breaches of his fiduciary duties."

that Green aided and abetted the SP Directors' alleged breaches of fiduciary duties by (1) promising Mr. Weaver post-merger employment; (2) discussing the merger within the three-year period following SP's conversion from a mutually-owned thrift, during which federal regulations prohibited SP from negotiating a merger; (3) purchasing loans owed by the SP Directors to exert undue influence over them; (4) concealing from the SP Directors that CSC was a shareholder in Green; (5) soliciting a No Solicitation Clause; (6) negotiating the merger with an intent to exploit the SP Directors' conflicts of interest; (7) negotiating a termination fee should the merger break down; and (8) agreeing to indemnify the SP Directors. Finally, in Count V, the Complaint asserted a claim against CSC for aiding and abetting the SP Directors' alleged breaches of fiduciary duties.

### E. Motions to Dismiss

On December 19, 2014, the SP Defendants filed a motion to dismiss the Complaint against them, arguing that the court lacked personal jurisdiction over the SP Directors and that the Complaint failed to state a claim upon which relief could be granted against the SP Defendants. The motion included an affidavit of Director Williams, in which he attested that he was an SP Director prior to the merger and:

> 3. SP Bancorp, Inc. has at all times since its formation had its corporate offices in Plano, Texas. SP Bancorp, Inc., has not had any branch or office in Maryland, and has not conducted any corporate business in Maryland.
>
> 4. The banks previously owned and operated by SP Bancorp, Inc. were all located in the greater Dallas, Texas area, Louisville, Kentucky and Irvine, California.
>
> 5. The meetings of the SP Directors took place in Plano, Texas or sometimes by phone from Plano, Texas.

11

6.  The SP directors all live in Texas.  Paul Zmigrosky also has a residence in Michigan.  Carl Forsythe also has a residence in Massachusetts.

7.  On January 10, 2014, the SP Directors formed a Strategic Review Committee . . .  to consider potential strategic transactions involving SP Bancorp.  I was a member of that committee.  The [] committee held its meetings in Texas, or by phone from Texas.

The SP Defendants refuted Appellants' claim that SP was sold under value by pointing out that the merger was approved unanimously by all ten SP Directors, and that each owned substantial stock in the company and, therefore, had a personal interest in achieving the maximum sale price for the sale of SP.  They also contended that other than Mr. Weaver, none of the remaining nine Directors were alleged to have any potential role in the surviving bank and, "like the other SP Bancorp shareholders, the SP Directors' ownership interest was completely extinguished by the cash-out Merger."  Therefore, the Appellants based their Complaint "on the implausible assertion that all nine of the disinterested SP directors approved a merger that was contrary to each of their financial interests solely because Mr. Weaver might obtain a job with the surviving bank." Regardless, they argued, the SP Directors were not subject to jurisdiction in Maryland because SP is a "phantom" corporation, with none of its operations taking place in Maryland—it's headquartered in Texas and operates in Texas, Kentucky, and California.

The Green Defendants also filed a motion to dismiss the claims against Green for lack of personal jurisdiction, and to dismiss the claims against both Green Defendants for failure to state a claim.  They asserted that Maryland lacked personal jurisdiction over Green because all of the conduct on which Appellants based their claims occurred outside of Maryland and Green had no other connection to the forum.  Additionally, they argued

12

that Appellants failed to state a claim against Searchlight, because they "d[id] not make a single allegation about any conduct, let alone wrongful conduct," by Searchlight. Included with their motion was an affidavit by Mr. Greenwade, who attested that Green was incorporated and headquartered in Texas with "no offices or employees in Maryland." He further attested that Green does not solicit business in Maryland, "has no local address or local telephone number[,]" and "no agent to accept service in Maryland." In regard to the merger, he specified that no merger negotiations occurred in Maryland; that Green sent the letter of intent from Texas to the SP Directors in Texas; that SP responded by sending a letter to Green in Texas; that the parties negotiated in Texas and through counsel in New York; that Green conducted due diligence at SP's offices in Texas; that Green offered employment to Mr. Weaver by telephone in Texas; that Green signed the merger agreement in Texas and that he (Greenwade) believed that SP did as well; that the SP shareholders voted at a meeting in Texas; and that Green purchased the loans of several SP Directors from its offices in Texas.

Appellants countered that the SP Directors were subject to jurisdiction in Maryland because they "transacted business" in the forum by causing the merger between SP and Searchlight to be consummated in Maryland with the filing of the Articles of Merger. Appellants also contended that the SP Directors were subject to jurisdiction because the alleged tortious conduct—breaching their fiduciary duties—was not complete until the merger was consummated in Maryland. Exercising jurisdiction would satisfy due process, Appellants argued, because the SP Directors chose to consummate the merger in Maryland and chose Maryland law to govern the merger. Appellants insisted that "the formation of

13

a Maryland corporation to acquire another Maryland corporation and the consummation of that acquisition in Maryland is precisely the sort of 'significant activity' in Maryland that supports long arm jurisdiction."  Jurisdiction would comport with due process, according to Appellants, because Green purposefully availed itself of Maryland law by choosing to organize Searchlight under Maryland law rather than the law of another state.

The circuit court held a hearing on Appellees' motions on March 27, 2015. Subsequently, in a Memorandum Opinion and Order issued on April 8, 2015, the court dismissed the actions against Green and the SP Directors for lack of personal jurisdiction and/or failure to state a claim, and dismissed the actions against Searchlight and SP for failure to state a claim.  The court began with some general observations: neither SP nor Green had offices in Maryland or solicited business within the state; none of the SP Directors resided in Maryland; Green initiated merger negotiations in Texas; Green sent the letter of intent from Texas to SP in Texas; SP responded by sending its own letter to Green within Texas and negotiations continued in Texas and New York; and Green conducted due diligence in Texas.

The court ruled that Green was not subject to general jurisdiction in Maryland based on its incorporation of Searchlight in the state and that the Appellants otherwise "failed to show a 'substantial connection' between Green and Maryland, as they have not demonstrated that Green engaged in 'significant activities' or 'created continuing obligations' in Maryland."  Appellants, according to the court, provided no substantive support for their "principal-agent" theory between Green and Searchlight, only "vaguely allud[ing]" that Green was Searchlight's alter ego.  Further, the filing of the Articles of

14

Merger, which incorporated Searchlight, was not a "purposeful tortious act" under Maryland's long-arm statute, and no injury was felt in Maryland because Searchlight's incorporation was not central to the case. The court noted that "Searchlight did not exist until after the parties agreed to the Merger." Green did not "invoke" the benefits of Maryland law, the court continued; instead, it selected Delaware law to govern the merger and purchased a business that did not operate within Maryland. The court concluded that Maryland has neither general nor specific personal jurisdiction over Green, after observing the following:

> Plaintiffs have provided no support for their argument that forming a subsidiary is a "significant activity" that supports long-arm jurisdiction. Green has not engaged in "significant activities" or "created continuing obligations" in Maryland. Green is incorporated in Texas and has its headquarters in Houston. All of its branches are in Texas, except a branch in Kentucky[,] which was established subsequent to the Merger. Green has no local offices in Maryland nor does it conduct, transact, or solicit business in Maryland. Furthermore, it has no employees, addresses, telephone numbers, or agents for service of process in Maryland. No merger negotiations occurred in Maryland, and all of the meetings between Green and SP [] occurred in Texas, except for negotiations by counsel in New York.

Turning to the SP Directors, the court ruled that Appellants failed to prove that the Directors purposefully availed themselves of the laws of Maryland. The court ruled that mere acceptance of a directorship is not enough to subject the SP Directors to personal jurisdiction, reasoning that, unlike states such as Delaware, Maryland has not adopted a statute subjecting corporate directors to personal jurisdiction based on their acceptance of a directorship. Further, the court held, SP's conduct was not attributable to its Directors. It was SP—not the SP Directors—that signed and filed the Articles of Merger in Maryland. All of the SP Directors' conduct—the directors' meetings, shareholder meetings, and

15

merger negotiations—occurred in Texas and New York. Consequently, the court concluded, the SP Directors lacked minimum contacts in Maryland.

The court then dismissed the claims against Searchlight and SP, ruling that Appellants failed to state a claim against those defendants because the Complaint asserted no allegations against either Searchlight or SP.

For about six months following Appellees' dismissal from the action, Appellants' litigation continued against CSC until Appellants agreed to dismiss with prejudice their claim against CSC. Appellants then noted their timely appeal of the court's decision to dismiss Appellees from the case.

## DISCUSSION

### I.

### Legal Framework

We examine whether the circuit court was legally correct in dismissing the underlying action against Green and the SP Directors for lack of personal jurisdiction. *CSR, Ltd. v. Taylor*, 411 Md. 457, 472 (2009) (citations omitted).

In deciding whether a Maryland court may exercise personal jurisdiction over an out-of-state defendant, the court must examine whether jurisdiction is established under Maryland's long-arm statute and whether the exercise of jurisdiction comports with the Due Process Clause of the Fourteenth Amendment. *Id.* at 464. The Supreme Court has long held that the Fourteenth Amendment limits the power of state courts to exercise personal jurisdiction over out-of-state defendants. *Int'l Shoe*, *supra*, 326 U.S. at 311, 321; *Pennoyer v. Neff*, 95 U.S. 714, 733 (1878). In the seminal case of *International Shoe*, the

16

Supreme Court ruled that the Due Process Clause limits a state's exercise of personal jurisdiction over a foreign or out-of-state defendant to circumstances in which a defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" 326 U.S. at 316 (quoting *Milliken v. Meyer*, 311 U.S. 456, 463 (1940) (other citations omitted)).

Recently, in *Bristol-Myers*, *supra*, the Supreme Court emphasized that "[i]n determining whether personal jurisdiction is present, a court must consider a variety of interests[,]" including those of the forum state "'and of the plaintiff in proceeding with the cause in the plaintiff's forum of choice.' But the 'primary concern' is 'the burden on the defendant.'" 137 S. Ct. at 1780 (internal citations omitted). This burden includes not just the practical and logistical aspects of litigation but "the more abstract matter of submitting to the coercive power of a state that may have little legitimate interest in the claims in question." *Id.* In this way, "restrictions on personal jurisdiction 'are more than a guarantee of immunity from inconvenient or distant litigation. They are a consequence of territorial limitations on the power of the respective states.'" *Id.* (quoting *Hanson v. Denckla*, 357 U.S. 235, 251 (1958)). Still, following *International Shoe*, "'the relationship among the defendant, the forum, and the litigation, rather than the mutually exclusive sovereignty of the States . . . became the central concern of the inquiry into personal jurisdiction.'" *Daimler, supra*, 134 S. Ct. at 754 (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)). Thereafter, courts applying the concept of "fair play and substantial justice" developed two categories of personal jurisdiction in cases involving out-of-state corporate defendants: general (or all-purpose) jurisdiction and specific (or case-linked) jurisdiction. *Id.*; *see also*

17

*Bristol-Myers*, 137 S. Ct. at 1779-80; *Goodyear*, 564 U.S. at 919.

General jurisdiction over a company exists only in "instances in which the continuous corporate operations within a state [are] so substantial and of such nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities." *Int'l Shoe*, 326 U.S. at 318 (citations omitted). The Supreme Court has recently explained general jurisdiction by way of analogy to an individual defendant's domicile: general jurisdiction exists when a corporation is "at home" in the forum state. *Goodyear*, 564 U.S. at 924. "The 'paradigm' forums in which a corporate defendant is 'at home,' . . . are the corporation's place of incorporation and its principal place of business." *BNSF Ry. Co.*, 137 S. Ct. at 1558 (quoting *Daimler*, 134 S. Ct. at 761 n.19). A court with general jurisdiction over a company may hear any claim against that company, even if all of the activity that gave rise to the claim occurred in a different state. *Bristol-Myers*, 137 S. Ct. at 1780; *Goodyear*, 564 U.S. at 924.

"Specific jurisdiction is very different." *Bristol-Myers*, 137 S. Ct. at 1780. Specific jurisdiction exists only when the claim "arise[s] out of or relate[s] to the defendant's contacts with the forum[.]" *Helicopteros Nacionales de Colom., S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984). A defendant corporation is subject to specific personal jurisdiction only if it can be demonstrated that (1) the defendant has "purposefully directed its activities at residents of the forum"; (2) the plaintiff's claims "arise out of or relate to" those activities directed at the state; and (3) whether the exercise of personal jurisdiction would "comport with fair play and substantial justice" so as to be constitutionally reasonable. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 476 (1985) (internal quotation marks and citations

18

omitted).  *See also CSR, Ltd.,* 411 Md. at 477; *Beyond Sys., Inc. v. Realtime Gaming Holding Co., LLC*, 388 Md. 1, 26 (2003).  In determining what is reasonable under the Due Process Clause and would not offend "traditional notions of fair play and substantial justice," *Int'l Shoe*, 326 U.S. at 316, we consider several factors.  Those factors are "the burden on the defendant, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Burger King*, 471 U.S. at 477 (internal quotation marks omitted) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)); *see also Asahi Metal Indus. Co., Ltd. v. Superior Ct. of Cal., Solano Cty.*, 480 U.S. 102, 113 (1987).

We must emphasize that when based on specific jurisdiction, a court's adjudicatory authority is limited to those "'issues deriving from, or connected with, the very controversy that establishes jurisdiction.'"  *Goodyear*, 564 U.S. at 919 (citation omitted).  This "category [of jurisdiction] is represented by *International Shoe* itself, a case in which the in-state activities of the corporate defendant 'had not only been continuous and systematic, but also g[a]ve rise to the liabilities sued on.'"  *Daimler*, 134 S. Ct. at 754 (quoting *Int'l Shoe*, 326 U.S. at 317).  "[T]he commission of certain 'single or occasional acts' in a State may be sufficient to render a corporation answerable in that State with respect to those acts" without rendering the corporation subject to jurisdiction more generally "with respect to matters unrelated to the forum connections."  *Goodyear*, 564 U.S. at 923 (quoting *Int'l Shoe*, 326 U.S. at 318).  This means that continuous activity of only "some sorts" within a

19

state "'is not enough to support the demand that the corporation be amenable to suits unrelated to that activity.'" *Bristol-Myers*, 137 S. Ct. at 1781 (citation omitted).

In its more recent cases, the Supreme Court has cautioned against blending the general jurisdiction analysis with that of specific jurisdiction, explaining that a corporation's ties that would "serv[e] to bolster the exercise of specific jurisdiction do not warrant a determination that, based on those ties, the forum has *general* jurisdiction over a defendant." *Goodyear*, 564 U.S. at 927 (emphasis added) (noting that the North Carolina Court of Appeals "elided the essential difference between case-specific and [all-purpose] general jurisdiction"). Several months ago, the Supreme Court reiterated this point. In *Bristol-Myers*, the Court held that the "settled principles" of specific jurisdiction "provide no support" for a "sliding scale" approach that treats personal jurisdiction as if it exists on a continuum, permitting states to exercise specific jurisdiction over corporations not at home in the state based off of the volume of general forum contacts the corporation has *unrelated* to the claim at issue.[8] 137 S. Ct. at 1780.

---

[8] After the parties briefed and argued the instant appeal, the Supreme Court heard *Bristol-Myers* and *BNSF Ry. Co.* Anticipating these decisions, we held this opinion back in the event that either case were to alter the applicable jurisdictional analysis (and, if so, to permit the parties to file additional briefing). We determine, however, that both opinions reaffirm the Court's contemporary 'clarification' of general and specific jurisdiction as articulated in *Goodyear* and *Daimler*.

In *BNSF Ry. Co.*, the Supreme Court considered the cases of two injured workers who brought suit in Montana against the defendant railroad company that had thousands of miles of track in Montana and employed thousands of workers in the state, but was incorporated in Delaware and principally located in Texas. 137 S. Ct. at 1554. In holding that the defendant railroad was not "at home" in Montana for purposes of general personal jurisdiction, Justice Ginsburg reiterated: "The Fourteenth Amendment due process constraint described in *Daimler* . . . applies to all state-court assertions of general

20

## II.

## Green

Appellants contend that Maryland has jurisdiction over Green based on both modalities of personal jurisdiction. First, they maintain that Green is subject to general jurisdiction in Maryland because of Searchlight's presence in the state, given that Searchlight is Green's mere instrumentality. Second, they claim Maryland can exercise specific jurisdiction over Green by way of its long-arm statute because the company "transacted business" in the state when it formed Searchlight under Maryland law and consummated the merger in Maryland.

---

jurisdiction over nonresident defendants; the constraint does not vary with the type of claim asserted or business enterprise sued." *Id.* at 1558-59.

*Bristol-Myers* involved a California State court mass action against Bristol-Myers, a drug company and resident of Delaware and New York, for alleged injuries caused to the plaintiffs by the drug Plavix. 137 S. Ct. at 1778. The plaintiffs were 86 California residents and 592 residents from 33 other states. *Id.* Bristol-Myers challenged the California court's personal jurisdiction over it in regard to the claims asserted by the out-of-state plaintiffs. *Id.* at 1777-78. The Court held that the Due Process Clause did not permit California's exercise of specific personal jurisdiction over the out-of-state consumers, and noted that "[o]ur settled principles regarding specific jurisdiction control this case." *Id.* at 1781, 1783; *but see id.* at 1789 (Sotomayor, J., dissenting) ("The effect of the Court's opinion today is to eliminate nationwide mass actions in any State other than those in which a defendant is 'essentially at home'" (internal quotations omitted)). We note that the Supreme Court's rejection of the California Supreme Court's "sliding scale" approach in *Bristol-Myers* calls into question the conception the Court of Appeals articulated in *Camelback Ski Corp. v. Behning*—that where personal jurisdiction does not "fit neatly" into the categories of specific and general jurisdiction "the proper approach is to identify the approximate position of the case on the continuum that exists between the two extremes, and apply the corresponding standard, recognizing that the quantum of required contacts increases as the nexus between the contacts and the cause of action decreases." 312 Md. 330, 339 (1988). Given that in the instant case Appellants allege that Green had only one contact in Maryland—the incorporation of Searchlight—we do not need to examine the viability of the sliding scale approach in this appeal.

## A. General Jurisdiction

Appellants do not contend that Green is "at home" in Maryland. Instead, they claim that Green is subject to general jurisdiction in Maryland by virtue of its ownership of Searchlight. According to Appellants, Green formed Searchlight as an instrumentality, or alter ego, for the sole purpose of engaging in the merger, and exercised complete control over Searchlight until the merger was completed, at which point Searchlight ceased to exist. Appellants maintain that Maryland law permits courts to attribute a subsidiary's actions to its foreign parent corporation when the parent is "closely allied" with the subsidiary and exercised "actual supervision and control" over its activities. *Harris v. Arlen Props., Inc.*, 256 Md. 185, 199-200 (1969); *Thomas v. Hudson Sales Corp.*, 204 Md. 450, 454, 463, 466 (1954)).

Green responds, quoting from *Daimler*, 134 S. Ct. at 754, that Appellants must show that Green's contacts in Maryland were so "'continuous and systematic' as to render [it] essentially at home" here.[9] Green advances several reasons why Appellants cannot rely on the presence of Green's subsidiary in Maryland as a basis for general jurisdiction over Green. First, Green contends that its formation of a subsidiary in Maryland is insufficient

---

[9] Green claims that Appellants waived the argument that Green was subject to general jurisdiction in Maryland. Our review of the record, however, establishes that the argument was sufficiently preserved below. During argument before the circuit court, Appellants pressed their allegation that there was no legal distinction between Green and Searchlight, and the Green Defendants responded preemptively to that argument, maintaining that Appellants failed to allege facts sufficient to support piercing the corporate veil. Moreover, the circuit court specifically found that "[t]here is no general jurisdiction, as the only possible connection with Maryland is with Green's subsidiary, Searchlight, which is incorporated in Maryland."

22

under *Daimler*, 134 S. Ct. at 759-60, to subject it to general jurisdiction here. Second, Green observes that Appellants failed to allege any facts that would have allowed the court to pierce the corporate veil between Searchlight and Green. And, citing to *Daimler* again, Green points out that even if we were to impute Searchlight's contacts to Green, such contacts alone are still insufficient to establish *general* jurisdiction over it.

Until recently, the Supreme Court addressed general jurisdiction infrequently. In fact, from 1952 to 2011, the Court issued only two opinions in which general jurisdiction was the central issue. *See Helicopteros*, 466 U.S. at 418 (holding that "mere purchases [made in the forum state], even if occurring at regular intervals, are not enough to warrant a State's assertion of [general] jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions" (footnote omitted)); *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 447-48 (1952) (holding that a foreign corporation was subject to general jurisdiction in Ohio, its principal, albeit a limited-wartime place of business, and that it did not violate due process for Ohio to adjudicate a controversy that did not arise in that forum).

In the intervening 60 years, the Court of Appeals of Maryland and the United States Court of Appeals for the Fourth Circuit, consistent with *International Shoe*, *Perkins*, and *Helicopteros*, examined Maryland's ability to exercise general personal jurisdiction over corporations based on the companies' "continuous and systematic" contacts in the state. *See, e.g.*, *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 397 (4th Cir. 2003) (citations omitted); *CSR, Ltd.*, 411 Md. at 477-78 (further explaining that the defendant must have also "purposefully availed itself of the privilege of conducting

23

activities in the State," and then once minimum contacts are established within the forum state, those contacts must be considered in light of other factors to determine whether the assertion of personal jurisdiction comports with 'fair play and substantial justice'" (citations omitted)). Then, in 2011, 2014, and again just this year, the Supreme Court revisited the general jurisdiction doctrine. *See BNSF Ry. Co.*, 137 S. Ct. at 1558-59; *Daimler*, 134 S. Ct. at 760-62; *Goodyear*, 564 U.S. at 923-29. The Court in *Daimler* explained that the proper "inquiry under *Goodyear* is not whether a foreign corporation's in-forum contacts can be said to be in some sense 'continuous and systematic[;]' it is whether that corporation's 'affiliations with the State are so continuous and systematic as to render [it] essentially at home in the forum State.'"[10] *Daimler*, 134 S. Ct. at 761 (quoting *Goodyear*, 564 U.S. at 919).

The plaintiffs in *Daimler* were 22 residents of Argentina who brought suit in federal district court in California against DaimlerChrysler Aktiengesellschaft ("Daimler"), a German company. *Id.* at 750-51. Plaintiffs alleged that Daimler's subsidiary, Mercedes-Benz Argentina ("MB Argentina"), collaborated with State security forces during Argentina's 1976-1983 "Dirty War" to "kidnap, detain, torture, and kill certain MB Argentina workers, among them, plaintiffs or persons closely related to plaintiffs." *Id.* The plaintiffs predicated jurisdiction on a theory of general jurisdiction based on the California contacts of another Daimler subsidiary, Mercedes-Benz USA, LLC ("MBUSA"), which

---

[10] We are not aware of, nor have the parties referred us to, any Maryland State appellate decision that has addressed general jurisdiction since the Supreme Court's decisions in *Goodyear* and *Daimler*.

24

was incorporated in Delaware and principally located in New Jersey but did business in California. *Id.* at 751.

The federal district court granted Daimler's motion to dismiss, but the U.S. Court of Appeals for the Ninth Circuit reversed on the theory that a state can exercise jurisdiction over a parent corporation if its subsidiary performed "sufficiently important" services within the forum state. *Id.* Additionally, the Ninth Circuit "looked to whether the parent enjoys 'the right to substantially control' the subsidiary's activities." *Id.* at 760 n.15 (citation omitted). The Supreme Court, however, rejected both the "sufficiently important" and "substantial control" test. *Id.* at 759-60 & n.15. The Court explained that "in no event" could the Ninth Circuit's analysis be sustained because it would "subject foreign corporations to general jurisdiction whenever they have an in-state subsidiary or affiliate, an outcome that would sweep beyond even the 'sprawling view of general jurisdiction' [the Court] rejected in *Goodyear*." *Id.* at 759-60 (quoting *Goodyear*, 564 U.S. at 929). The Court disapproved of the exercise of general jurisdiction over a corporation "in every State in which a corporation engages in a substantial, continuous, and systematic course of business" reasoning that such a formulation was "unacceptably grasping." *Id.* at 760-61 (citation and internal quotation marks omitted).

*Daimler* expressly rejected an approach that would subject a foreign corporation to general jurisdiction based on its control of a subsidiary resident in the forum state.[11] *Id.* at

---

[11] Appellants rely on *Harris v. Arlen Props., Inc.* and *Thomas v. Hudson Sales Corp.* for the proposition that Maryland may exercise general jurisdiction over a foreign corporation for the actions of a "closely allied" subsidiary in Maryland over which the foreign company had "actual supervision and control." Appellants' reliance on these cases

759-60; *see also Vitro Elecs. v. Milgray Elecs., Inc.*, 255 Md. 498, 502 (1969) (observing that "numerous cases [] hold that a foreign corporation is not construed as doing business within a state merely because of its ownership of all of the shares of stock of another corporation doing business in the state." (citations omitted)). And in *BNSF Ry. Co.*, the Supreme Court underscored that "in-state business, as we clarified in *Daimler* and *Goodyear*, does not suffice to permit the assertion of general jurisdiction over claims . . . that are unrelated to any activity occurring" in the forum state. *BNSF Ry. Co.*, 137 S. Ct. at 1559.

Applying the foregoing legal precepts to the facts before us, we hold that Green cannot be said to be "at home" in Maryland with no contact in Maryland save for the fleeting existence of its merger subsidiary, Searchlight. *See Daimler*, 134 S. Ct. at 760 (citing *Goodyear*, 564 U.S. at 923). Consistent with *Daimler*, we hold that a nonresident parent corporation is not subject to general jurisdiction in Maryland based solely on its incorporation of a subsidiary within Maryland.

Appellants seek to distinguish *Daimler* by pointing to the fact that they allege

---

is misguided. The *Harris* case involved application of Maryland's long-arm statute and centered on the question of specific jurisdiction. *See* 256 Md. at 186. And *Thomas* is distinguishable on the facts. *Thomas* was a garnishment action. 204 Md. at 453. It is true that the Court of Appeals imputed to the parent company its subsidiary's forum contacts, reasoning that the corporate structure resembled a principal/agent relationship and the subsidiary, through its Maryland representatives, acted as if it were the parent company's sale's department. *Id.* at 463. But in *Thomas,* both the parent and subsidiary were Michigan companies, and the Court considered, for the purposes of garnishment, whether the extensive contacts by the subsidiary's agents in Maryland—to include a district manager and sales manager living in Maryland and soliciting business in Maryland—were sufficient for Maryland to exercise jurisdiction over the parent. *Id.* at 456-57.

Searchlight is an alter ego, while the plaintiffs in *Daimler* made no similar allegation. On this limited point, Appellants are correct—they have, in fact, alleged Searchlight is an alter ego, but they have failed to establish either the validity or the relevance of that allegation. They make no showing (or argument), for example, that Searchlight was fraudulently incorporated[12] or that Green and Searchlight failed to keep "separate records, separate and distinct accounting procedures, separate corporate books, and held separate directors' meetings." *See Vitro*, 255 Md. at 504-06 (refusing to pierce the corporate veil and "adopt a doctrine which . . . would have the effect of breaking down observed distinctions between parent and subsidiary corporations, where fraud or deception is not present"). More importantly, however, *regardless* of whether Searchlight was Green's alter ego, Appellants' general jurisdiction argument would still fail under *Daimler*. Appellants urge us to pierce the corporate veil of Searchlight to reach Green. Were we to do that, we would be back to examining Green's jurisdictional contacts in Maryland—of which its incorporation of Searchlight is the *only one*. Even if Green created a Maryland corporation as its alter ego, Green would remain subject to general jurisdiction only where it is "at home," which is normally its "place of incorporation and its principal place of business." *BNSF Ry. Co.*, 137 S. Ct. at 1552 (citation omitted). Appellants' concession that "Searchlight ceased to exist after the merger" only underscores the point that the

---

[12] "Maryland is more restrictive than other jurisdictions in allowing a plaintiff to pierce a corporate veil." *Residential Warranty Corp. v. Bancroft Home Greenspring Valley, Inc.*, 126 Md. App. 294, 309 (1999). In Maryland, we will disregard the corporate fiction only in instances of fraud or when necessary to "enforce a paramount equity." *Bart Arconti & Sons, Inc. v. Ames-Ennis, Inc.*, 275 Md. 295, 310 (1975) (citations omitted).

evanescent existence of Searchlight in Maryland could not have created even one *continuing* contact or affiliation by Green in Maryland.

## B. Specific Jurisdiction

Appellants argue that forming a Maryland corporation to acquire another Maryland corporation and consummating that merger in Maryland is "significant activity" bringing Green within reach of Maryland's long-arm statute. To support the point that Green invoked the protection of Maryland law by creating Searchlight, Appellants rely mainly on Delaware cases, such as *Sternberg v. O'Neil*, 550 A.2d 1105, 1123 (Del. 1988), which they contend are consistent with this Court's decision in *Sleph v. Radtke*, 76 Md. App. 418, 429 (1988). Appellants claim that the fact that Green was a party to the merger agreement, which called for the filing of the Articles of Merger in Maryland, is controlling and that it is irrelevant that the merger was negotiated outside of Maryland and that Green did not sign the Articles of Merger.

Appellants assert that Maryland has a substantial and legitimate interest in providing a forum to resolve claims involving the corporate fiduciaries of Maryland corporations. Although Appellants again cite Delaware case law to support this proposition, *Parfi Holding AB v. Mirror Image Internet*, 794 A.2d 1211, 1230 (Del. Ch. 2001), they seek to incorporate Maryland law by contending that this interest is consistent with the "internal affairs" doctrine, which dictates that Maryland corporation law is the province of Maryland courts. *Storetrax.com, Inc. v. Gurland*, 397 Md. 37, 52 (2007) ("'[O]nly one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and

28

shareholders—because otherwise a corporation could be faced with conflicting demands.'" (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982)).

Green insists that its single contact with Maryland does not subject it to specific jurisdiction here. Relying in large part on *Vitro*, *supra*, Green asserts that Appellants do not and cannot claim that the act of incorporating Searchlight or the filing of the Articles of Merger were themselves wrongful or that these were the acts giving rise to their substantive claims.

It is telling, Green suggests, that Appellants rely on unpublished Delaware decisions rather than the rules the Supreme Court has enumerated. For example, Green contends that applying the *Burger King* analysis, Appellants "have not, and cannot, show a 'substantial connection' between Green and Maryland, because Green has not engaged in 'significant activities' or 'created continuing obligations' in Maryland.'" *Burger King*, 471 U.S. at 475-76. Green contends, citing *Aphena Pharma Solutions-Md. LLC v. BioZone Labs. Inc.,* 912 F. Supp. 2d 309, 315 (D. Md. 2012), that "transacting business" in Maryland has been applied narrowly to companies that engage in significant negotiations and/or intentional advertising and selling in Maryland. Green points out that it is a Texas corporation with its principal place of business in Texas and that SP's only non-Texas branch that Green acquired was in Kentucky. Therefore, Green's transaction with SP did not "create continuing obligations invoking the benefits and protections of Maryland law," because all of SP's offices and branches were in Texas and Kentucky—despite its past incorporation in Maryland.

Green maintains that all the misconduct alleged in the Complaint occurred in Texas:

(1) Green representatives met with SP in Texas; (2) Green purchased the loans from SP in Texas; (3) Green's alleged discussions concerning Mr. Weaver's future employment occurred wholly within Texas, where Mr. Weaver is employed; and (4) the parties executed the merger agreement in Texas.[13]

Maryland has construed its long-arm statute to authorize the exercise of personal jurisdiction "to the full extent allowable under the Due Process Clause." *CSR, Ltd.*, 411 Md. at 473 (citation omitted). The statute is found in the Courts and Judicial Proceedings Article ("CJP") of the Maryland Code (1973, 2013 Repl. Vol.), and provides:

§ 6-103. **Cause of action arising from conduct in State or tortious injury outside State.**

(a) *Condition*. – If jurisdiction over a person is based solely upon this section, he may be sued only on a cause of action arising from any act enumerated in this section.
(b) *In general*. – A court may exercise personal jurisdiction over a person, who directly or by an agent:
(1) Transacts any business or performs any character of work or service in the State;
(2) Contracts to supply goods, food, services, or manufactured products in the State;
(3) Causes tortious injury in the State by an act or omission in the State;
(4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State;

---

[13] Green states in its brief that, although the parties agreed that Delaware law would govern the merger agreement and any disputes thereunder, Maryland law still governs to the extent that it is "mandatorily applicable." We agree with Green. The question of whether Maryland may exercise jurisdiction over a nonresident corporation is not a question of Delaware substantive law, but a dual consideration of this state's long-arm statute and the Fourteenth Amendment's Due Process Clause. *See Dynacorp Ltd. v. Aramtel Ltd.*, 208 Md. App. 403, 478 (2012).

30

(5) Has an interest in, uses, or possesses real property in the State; or

(6) Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation, or agreement located, executed, or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.[14]

Pertinent to this appeal, Appellants allege only that § 6-103(b)(1) applies, conferring personal jurisdiction over an out-of-state defendant when the plaintiff(s) can prove that the defendant "[t]ransacts any business" in the state.[15] We begin, then, by analyzing whether Green's contacts amount to "transact[ing] any business" in Maryland within the meaning of our long-arm statute. In so doing, we apply the three-pronged inquiry, *supra*, for determining whether the exercise of specific personal jurisdiction over the defendants in this case would comport with due process. *See Beyond Sys.,* 388 Md. at 22 ("Because we have consistently held that the reach of the long arm statute is coextensive with the limits of personal jurisdiction delineated under the due process clause . . ., our statutory inquiry merges with our constitutional examination." (citing *Mohamad v. Michael*, 279 Md. 653, 657 (1977)).

### 1. "Purposeful Availment" and "Arising Out of"

The Supreme Court has instructed that when a state seeks to exercise specific jurisdiction over an out-of-state defendant who has not consented to suit there, the defendant must have "purposefully directed" activities "at residents of the forum," and the

---

[14] Subsection (C) of CJP § 6-103 applies to computer information and computer programs.

[15] In the proceedings below, Appellants also alleged that jurisdiction was proper under the long-arm statute based on tortious injury, but they have abandoned that argument on appeal.

litigation at issue must "result[] from alleged injuries that 'arise out of or relate to' those activities." *Burger King*, 471 U.S. at 472 (citations omitted). The "'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or the 'unilateral activity of another party or a third person.'" *Id.* 471 U.S. at 475-76 (citations omitted). Therefore, when a defendant has "'deliberately' engaged in significant activities within a State" or created "continuing obligations" there, the defendant has assumed the privilege of conducting business in the forum. *Id.* (citations omitted). And because these activities enjoy the benefits and protections of the state's laws, "it is presumptively not unreasonable to require [the defendant] to submit to the burdens of litigation in that forum as well." *Id*. (citations omitted).

In order to illustrate what is meant by the requirement that the litigation must result from alleged injuries that "arise out of or relate to" activities "purposefully directed" at the forum state, the *Burger King* Court provided the following examples:

> Thus "[t]he forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State" and those products subsequently injure forum consumers. Similarly, a publisher who distributes magazines in a distant State may fairly be held accountable in that forum for damages resulting there from an allegedly defamatory story. And with respect to interstate contractual obligations, we have emphasized that parties who "reach out beyond one state and create continuing relationships and obligations with citizens of another state" are subject to regulation and sanctions in the other State for the consequences of their activities.

*Id.* at 472-73 (internal citations omitted). *See also Waldon v. Fiore*, 134 S. Ct. 1115, 1119-120, 1124 (2014) (When asked to decide whether a court in Nevada could exercise personal

32

jurisdiction over a Georgia police officer on the basis that he knew that confiscating funds found on petitioners while travelling through Georgia would cause harm to the petitioners in Nevada where they lived, the Supreme Court held that the Nevada court lacked personal jurisdiction because no part of the officer's conduct occurred in Nevada and a plaintiff cannot be the only link between the defendant and the forum.)

Under Maryland's long-arm statute, "[a] nonresident who has never entered the state, either personally or through an agent, may be deemed to have 'transacted business' in the State within the meaning of [CJP § 6-103(b)(1)] as long as his or her actions culminate in 'purposeful activity' within the State." *Sleph*, 76 Md. App. at 427 (citations omitted). "The quality and quantity of contacts required to support the exercise of personal jurisdiction will depend upon the nature of the action brought and the nexus of the contacts to the subject matter of the action." *Id.* at 428 (citing *Camelback Ski Corp. v. Behning*, 312 Md. 330, 333 (1988) [hereinafter "*Camelback II*"]). Thus, a single tortious contact with the state may create specific jurisdiction, but several contacts related to the cause of action only tangentially may not. *Id.*

According to the Court of Appeals, to satisfy the "purposeful availment" requirement, there must be

> so substantial a connection between [the defendant] and the forum state that having to defend a lawsuit there would be foreseeable. In Maryland, a substantial connection will be established if [the defendant] either engaged in significant activities in the State, or created continuing obligations with the State's residents, thus taking advantage of the benefits and protections of Maryland law.

*CSR*, *Ltd.*, 411 Md. at 464-65. In *CSR*, *Ltd.*, the defendant-petitioner, Colonial Sugar

33

Refining Co., Ltd. ("CSR"), was an Australian company that acted as the exclusive U.S. distributor for its wholly-owned subsidiary, which was also an Australian company. *Id.* at 465. CSR sold asbestos to customers outside of Maryland, but some of its product passed through the Port of Baltimore. *Id.* The plaintiff-respondents were the personal representatives of two men who worked as stevedores at the Port and eventually died from mesothelioma, which they contended was caused by asbestos exposure at the Port. *Id.* at 464. CSR challenged whether its conduct fell within the scope of Maryland's long-arm statute, arguing that it never purposefully directed its goods toward the state; it "never conducted or solicited any business in Maryland;" it was "never incorporated or licensed to do business in Maryland;" it "never appointed an agent for the purpose of accepting service of process in Maryland;" and it "never maintained an office, telephone listing, mailing address, or bank account in Maryland, nor did it own, lease, or possess an interest in property in the State." *Id.* at 466-67. Plaintiffs, on the other hand, insisted that CSR transacted business in Maryland by utilizing the Port of Baltimore, and specified that at least three CSR shipments that went through the Port were "Cost, Insurance, Freight" arrangements, meaning that CSR retained responsibility for the cargo until it was unloaded in Baltimore. *Id.* at 468-69 & n.5 Plaintiffs also noted that CSR advertised its product regularly in a trade magazine that was distributed in Maryland. *Id.* at 469. The circuit court found these contacts insufficient and dismissed the claim against CSR for want of personal jurisdiction. *Id.* at 469-70.

The Court of Appeals granted CSR's petition for certiorari and reversed this Court's interim decision in which we concluded that the shipment of asbestos to Maryland

established minimum contacts. *Id.* at 470-71. The Court of Appeals held that the exercise of jurisdiction over CSR would have offended the Due Process Clause, reasoning that CSR's shipments through Baltimore "d[id] not satisfy the 'purposeful availment' requirement because CSR neither engaged in significant activities in Maryland nor created continuing obligations with the residents of the State." *Id.* at 476, 486. The Court observed that CSR had no customers in Maryland and no professional relationship with the Maryland stevedores; that Maryland's port was merely a conduit, not where CSR directed its sales; that the sales were directed through Maryland at the direction of CSR's customers, not CSR; and that CSR likely would not need to use Maryland courts to sue buyers because buyers pay CSR before it ships its goods, making the port-state an unlikely venue for CSR to bring suit. *Id.* at 487-91 & n.12. In regard to the magazine advertisements, the Court concluded that CSR did not target its advertising specifically to Maryland customers, and it was insufficient for purposes of conferring jurisdiction that it may have been foreseeable that the advertisements would reach Maryland. *Id.* at 492-93 (citation omitted).

Turning our focus now to cases that involved factual circumstances more similar to those presented in this appeal, we start with *Vitro*, *supra*, in which the Court of Appeals considered whether Maryland's long-arm statute reached the parent of a Maryland corporation based on the subsidiary's presence in the state and the parent's execution of a single document. 255 Md. at 499-501, 506-07. Vitro, a Delaware corporation qualified to do business in Maryland, purchased certain electronic parts from Milgray/Washington, Inc., a Maryland corporation. *Id.* at 499-500. Vitro's contract had conditioned the sale on the parts' compliance with certain government specifications. *Id.* In completing the sale,

35

Milgray/Washington, Inc. obtained the necessary parts from its parent company—Milgray Electronic Inc., a New York corporation. *Id.* at 500. The parent company sent the parts to its subsidiary, which in turn sent them to Vitro. *Id.* Vitro became concerned that the parts were non-compliant and requested a certificate of compliance to which it was entitled under its contract with the subsidiary. *Id.* The parent company drafted a certification in response, sent it to the subsidiary, which in turn sent it to Vitro. *Id.* The government rejected the parts as non-compliant. *Id.*

Vitro filed suit in Maryland against both the parent and its subsidiary, and the parent moved the court to dismiss the claim against it for lack of personal jurisdiction. *Id.* The circuit court held a hearing to consider the motion and found the following facts: the parent owned 100% of the subsidiary's common stock; the two corporations had the same officers; the same accountant handled the books for both corporations out of the same office; the parent listed a Maryland address in the local telephone book; and the subsidiary stocked a supply of the parent's products in its inventory; but, the two corporations maintained separate books, records, minutes, directors' meetings, and accounting procedures. *Id.* Additionally, the court found that Vitro and the subsidiary executed their contract in New York, but it was unclear where the parties executed the compliance certificate or how it was delivered to the subsidiary. *Id.* at 500-01. Based on these findings, the circuit court dismissed the claim against the parent corporation for want of personal jurisdiction, and Vitro appealed. *Id.*

On appeal, the Court of Appeals reasoned that the weakness in Vitro's case was that the parent corporation did not engage in any activities that could add up to persistent

36

contacts with Maryland, such as "direct solicitation by sales representatives in the state, the sending of price lists to customers through the mails, general mail advertising combined with advertising in periodicals circulated in the state, participation with the locally franchised dealer in promoting sales, and the presence in the state of service and maintenance representatives." *Id.* at 505-06 (citation and quotation marks omitted). In addition to the parent corporation's lack of direct contacts with Maryland, the Court observed that the parent and subsidiary "took pains to maintain separate records, separate and distinct accounting procedures, separate corporate books, and held separate directors' meetings" and concluded that it could not, "out of hand, brush aside these observed distinctions." *Id.* at 506.

Ultimately, however, the Court remanded the case. *Id.* at 507-08. In considering whether the parent company was subject to specific personal jurisdiction in Maryland by issuing the certificate, the Court reasoned that it could have been, "*if* the certificate had been *fraudulently or negligently executed*, causing tortious injury to the [plaintiff]." *Id.* at 506 (emphasis added; footnote omitted). Thus, the Court determined that it was not enough that the parent company executed a letter on behalf of its Maryland subsidiary—it must have done so tortiously, and that tort must have occurred in the state in order for Maryland to exercise personal jurisdiction based on that contact. *Id.* at 507. But because the record on appeal was insufficient to determine how or where the certificate was executed, the Court left that issue to be determined on remand. *Id.*

In another case, this Court held that entering into a single, one-time contract for the purchase of two packaging machines amounted to purposeful availment. *Jason Pharm.,*

*Inc. v. Jianas Bros. Packaging Co., Inc.*, 94 Md. App. at 428, 435 (1993). The defendant, Jianas Brothers Packaging Co. ("Jianas"), a Missouri company, initiated contact with a corporation based in Maryland, Jason Pharmaceuticals, Inc. ("Jason"), for the purchase of the machines. *Id.* at 428. Over several months, Jianas negotiated a contract by making about 40 telephone calls to Jason's business in Maryland. *Id.* at 429. Once the parties agreed to terms, Jianas counter-signed the proposal for the machines at a sale price of $700,000, and sent the contract along with a $35,000 down payment to Jason in Maryland, which Jason then deposited the payment in a Maryland bank. *Id.* Prior to the sale, Jason stored the machines in Ohio until they were sent to Kentucky so that a third party could test them. *Id.* The third party refused to sign the warranty as it appeared in the proposal but signed a modification of the warranty. *Id.* When Jianas failed to complete the sale, Jason brought suit in Maryland. *Id.* at 428-29.

At the outset, Judge Rosalyn Bell, writing for this Court, determined that the case turned on the question of specific (rather than general) jurisdiction because it involved a contractual dispute, and applied Maryland's long-arm statute to the facts presented. *Id.* at 430. This Court held that a person negotiating with a company located in Maryland and then sending a down payment to Maryland constituted "transacting business" within the meaning of the long-arm statute, CJP 6-103(b)(1). *Id.* at 433.

We later distinguished *Jason* in *Zavian v. Foudy*, 130 Md. App. 689, 701-02 (2000). In *Zavian*, a Maryland attorney brought suit against three nonresident athletes on the United States Women's National Soccer Team after the women refused to pay the attorney's fees allegedly due under a management contract that the attorney had terminated.

38

*Id.* at 691-92. The parties' relationships began when each defendant contacted the attorney in Maryland after finding her name on a list of attorneys willing to provide discounted or pro bono legal services to female athletes. *Id.* & n.1. The attorney negotiated the contracts by phone and mail from her Maryland office, where she also drafted the contracts and sent them along with payment invoices to the athletes. *Id.* at 691-92. Then, pursuant to the contracts, the attorney engaged in substantive negotiations from her Maryland office with a number of apparel companies on the athletes' behalf. *Id.* at 692.

We affirmed the circuit court's grant of the athletes' motion to dismiss for lack of personal jurisdiction. *Id.* We reasoned that the actions and negotiations the attorney made in her capacity as the athletes' manager could not be imputed to the athletes for the purpose of establishing minimum contacts by the athletes. *Id.* at 699. We concluded that "appellees did not purposely seek a Maryland agent, endorsements of Maryland companies, or advertisements directed to Maryland soccer fans." *Id.* at 702. The athletes contacted the attorney because her name was on the list of attorneys willing to represent athletes, not because she was a Maryland lawyer. *Id.* Distinguishing the facts in *Zavian* from those in *Jason*, we noted that unlike the "'extensive negotiations'" in *Jason*, the athletes engaged in little to no negotiations over the terms of the management contracts, they never visited Maryland, and the claim for unpaid fees suggests they never sent a check to Maryland. *Id.* at 701-02. Therefore, we concluded, the athletes' contacts did not amount to "transacting business" in Maryland pursuant to the state's long-arm statute. *Id.* Although the contracting parties in *Zavian* intended to create an ongoing relationship, as compared to the single purchase contract in *Jason*, we focused on the quality of the athletes' purposeful

39

contacts with the forum to determine whether they were such that they *intended* to avail themselves of the benefits and protections of Maryland law. *Id.*

The Fourth Circuit considered the minimum contacts necessary to exercise jurisdiction over a foreign corporation that contracted with a Maryland corporation in *Ellicott Machine Corp., Inc. v. John Holland Party Ltd.*, 995 F.2d 474 (4th Cir. 1993). In that case, Ellicott, a Maryland corporation, brought a declaratory judgment action against Holland, an Australian corporation, arising out of a subcontract between the two parties. *Id.* at 475-76. The two parties began negotiations in Australia at the behest of the general contractor, which owned a 10% interest in Holland, but Ellicott rejected Holland's bid. *Id.* at 476. Holland then contacted Ellicott in Maryland and faxed to Maryland a revised bid on the subcontract. *Id.* The parties revised and exchanged copies of a draft purchase agreement between Australia and Maryland over a month and a half, negotiating along the way via letter, fax, and telephone. *Id.* Ellicott eventually accepted Holland's terms and Holland began performing the contract in Australia until unforeseen costs caused it to demand more money than the subcontract called for, at which point Ellicott filed for a declaratory judgment in Maryland. *Id.* The federal district court granted Holland's motion to dismiss for lack of personal jurisdiction because of its insufficient forum contacts, and Ellicott appealed. *Id.* at 476-77.

The Fourth Circuit affirmed on appeal, holding that Maryland's exercise of jurisdiction over Holland would violate the Due Process Clause.[16] *Id.* at 479-80. Although

---

[16] The Fourth Circuit explained that it need not analyze whether Holland "transacted business" within the meaning of Maryland's long-arm statute separately from the minimum

Holland initiated the business relationship and pursued Ellicott to Maryland, the Court determined that these contacts were fairly insubstantial and mitigated by the fact that Holland had no other contacts with Maryland, the contract did not have a "'substantial connection'" to Maryland, because it was performed in Australia, and the parties did not have a long-standing relationship. *Id.* at 478-79 (quoting *Burger King*, 471 U.S. at 481).

Appellants in this appeal rely principally on *Harris* and *Sleph*. In *Harris*, a Maryland real estate broker, Harris, allegedly entered into a "'co-op' sales arrangement with another real estate broker" for the sale of a specific property. 256 Md. at 187. After that property sold without his knowledge, Harris brought an action for lost commissions against the broker, the sellers, and the purchasers, many of which were nonresidents, including Arlen, a developer incorporated in New York. *Id.* at 186, 190. The circuit court dismissed the action against several of those defendants, including Arlen, for lack of personal jurisdiction, and Harris appealed. *Id.* at 191-94. The case made its way to the Court of Appeals, where, in considering whether Arlen's forum contacts brought it within the scope of Maryland's long-arm statute, the Court found it "of no material consequence" that Arlen had negotiated and executed the sales contract in the District of Columbia. *Id.* at 198. The Court focused instead on other acts that Arlen and its agents purposefully conducted in Maryland, including: its agents' persistent site visits, Arlen's engineers filing a building permit with Prince George's County, negotiations with the telephone company

---

contacts inquiry under the Due Process Clause, "[b]ecause the Maryland legislature designed its long-arm statute to extend personal jurisdiction to the limits allowed by federal due process, our normal two-step inquiry merges into one." *Ellicott*, 995 F.2d at 477 (citing *Mohamed*, 279 Md. at 657 (1977).

41

for an easement to run cables, and its engineers arranging for the installation of storm drains. *Id.* at 196-98. The Court imputed to Arlen these forum contacts by its agents and held that they amounted to "transacting business" as the term is used under Maryland's long-arm statute. *Id.*

The defendants in *Sleph* were a husband and wife, both residents of Virginia, who negotiated and purchased a 79% interest in five commercial properties in Maryland, and thereafter visited those properties on numerous occasions to check on their investment. 76 Md. App. at 421-22. This Court held that "[t]heir activities within this State, before and after the execution of their mortgage, performed directly and through their co-venturers, constituted sufficient purposeful activity to satisfy the [long-arm] statute." *Id.* at 427. We reasoned that their commercial real estate venture "creat[ed] a 'continuing obligation' between [the defendants] and a Maryland resident which invoked the benefits and protections of Maryland law." *Id.* at 429. "Of the relevant considerations, we deem[ed] none more compelling than the interest of this State, as well as the interest of the interstate judicial system, in providing a single forum for the litigation of disputes *that arise from interests in land* located within the forum." *Id.* (emphasis added).

The *Sleph* Court did not rule—as Appellants suggest—that the filing of a legal instrument in Maryland automatically subjects a defendant to specific jurisdiction. Rather, this Court emphasized Maryland's interest "in providing a single forum for the litigation of disputes that arise from *interests in land* located within the forum." *Id.* at 429 (emphasis added). That interest is absent in the case *sub judice*.

Applying the principles rendered in the foregoing decisions, we hold that Green has

42

not "transacted business" in Maryland within the meaning of our long-arm statute. Maryland's specific jurisdiction over Green is necessarily limited to Appellants' causes of action arising from Green's forum contacts. At the outset we can discard Appellants' contention that Green's ownership of a subsidiary in Maryland subjects it to specific jurisdiction here. To the extent this claim bleeds into general jurisdiction (i.e., Green is subject to jurisdiction based solely on its ownership interest in a subsidiary corporation in Maryland), we have already addressed that argument.[17] Appellants urge, however, that it was Green's act of filing Searchlight's Articles of Incorporation in Maryland that establishes specific jurisdiction over Green in Maryland. Appellants do not allege—nor is there any indication—that Green was negligent, fraudulent, or otherwise tortious by its incorporation of Searchlight.[18] Rather, Appellants appear to allege that Green, by a number of acts that took place in Texas, exerted improper influence over the SP Directors to aid and abet the Directors' alleged breaches of fiduciary duties, culminating in their self-serving decision to merge with Green and Green's incorporation of Searchlight in Maryland. But against these facts, the mere act of filing Searchlight's Articles of

---

[17] Appellants relied on the Supreme Court of Delaware's decision in *Sternberg v. O'Neil*, 550 A.2d 1105, 1123 (Del. 1988), to support jurisdiction on these grounds. In *Sternberg*, the Court sustained the exercise of jurisdiction over a foreign parent corporation in a suit based on the alleged wrongdoing of its subsidiary, which the parent corporation registered as a Delaware corporation. *Id.* In light of the Supreme Court's decision in *Daimler*, however, the Supreme Court of Delaware ruled recently that its decision in *Sternberg* is too broad to be consistent with *Daimler*. *Genuine Parts Co. v. Cepec*, 137 A.3d 123, 126-28 (Del. 2016).

[18] Appellants' counsel conceded at oral argument before this Court that Searchlight's filing of the Articles of Merger was neither fraudulent or tortious.

Incorporation in Maryland falls short of the grip of Maryland's long arm.

First, the facts do not demonstrate that Green purposefully availed itself of doing business in Maryland. We do not say that the act of forming a subsidiary in Maryland cannot subject a parent company to personal jurisdiction in Maryland, but "[t]he quality and quantity of contacts required to support the exercise of personal jurisdiction will depend upon the nature of the action brought and the nexus of the contacts to the subject matter of the action." *Camelback II*, 312 Md. at 338; *Sleph*, 76 Md. App. at 428. Here, the subsidiary formed by Green was not intended to do business in Maryland and nothing about the formation of the subsidiary was directed at residents of Maryland. Green has no offices in Maryland, does not solicit business in Maryland, and has no registered agent in Maryland. Even Searchlight was given a Texas address. In Maryland, a substantial connection will be established if the defendant "either engaged in significant activities in the State, or created continuing obligations with the State's residents, thus taking advantage of the benefits and protections of Maryland law." *CSR, Ltd.*, 411 Md. at 464-65. Clearly, Green did not intend to establish continuing obligations in Maryland by forming Searchlight.

The second failing in Appellants' argument is that the filing of Searchlight's articles of incorporation was—at best—only tangentially related to Appellants' claim for aiding and abetting. The power of Maryland courts to exercise specific jurisdiction is confined to "'issues deriving from, or connected with, the very controversy that establishes jurisdiction.'" *Goodyear*, 564 U.S. at 919 (citation omitted). It is not the mere filing of a legal instrument in Maryland that gives rise to specific jurisdiction, but the execution of an

44

instrument that is fraudulent or causes a tortious injury within Maryland. *See Vitro,* 255 Md. at 506-07 (remanding the case so that the trial court could determine where the parent executed the allegedly faulty certificate of compliance and whether its execution was negligent or fraudulent); *Food Fair Stores, Inc. v. Greeley,* 264 Md. 105, 110 (1972) (placing no jurisdictional significance on the trustee's mailing from Pennsylvania to Maryland a letter to the plaintiff denying his pension benefits absent any indication that the trustee played any role in the decision to deny the plaintiff's benefits claim); *see also Christian Book Distrib., Inc. v. Great Christian Books, Inc.*, 137 Md. App. 367, 395 (2001) (holding that it would violate the Due Process Clause to exercise jurisdiction based on the defendant faxing a closing document (containing an alleged negligent misrepresentation) to Maryland absent any allegation of fraud when the defendant was never physically present in the forum state and had no other connection to that State); *cf. Harris*, 256 Md. at 196-97 (reasoning that the defendant's persistent conduct in Maryland "may have been tortious, thus, rendering him, individually, subject to suit in Maryland").

Appellants offer that the successful negotiation of a merger with a Maryland corporation culminating in the filing of the Articles of Merger in Maryland constituted transacting business in Maryland. As Appellants acknowledge, however, Green was not a signatory to the Articles of Merger, and Searchlight, not Green, filed the Articles of Merger in Maryland. To impute to Green the *specific* jurisdictional contacts of its subsidiary (absent a showing of fraud or a clear disregard of the corporate fiction) would run counter to the Supreme Court's holdings in *Daimler,* 134 S. Ct. at 759-60, *Goodyear*, 564 U.S. at 929, and *World-Wide Volkswagen*, 444 U.S. at 295-99. In *Greeley* and *Zavian*, the Court

45

of Appeals and this Court, respectively, held that we will not impute to a defendant the jurisdictional contacts of a third party. *See Greeley*, 264 Md. at 110; *Zavian*, 130 Md. App. at 699. Clearly, Searchlight's filing of the Articles of Merger is not, by itself, sufficient to confer jurisdiction over Green in Maryland.

Once we remove Green's filing of Searchlight's Articles of Incorporation from our jurisdictional equation, there are no alleged activities by Green in Maryland—or directed at Maryland—left to consider. In what seems to be an implicit concession, Appellants place no emphasis on the jurisdictional relevance of the actual merger negotiations, despite their prominence in the aiding and abetting claims against Green. Presumably, this is because all the actions relevant to Appellants' allegations of aiding and abetting occurred outside of Maryland.[19] Green, a Texas corporation, engaged SP in negotiations in Texas— the place where SP is principally located. Green offered continued employment to Mr. Weaver in Texas, where he was employed at the time of the offer. The parties executed the merger agreement in Texas, and it included a Delaware choice-of-law provision. Green acquired SP's branches in Texas and Kentucky. SP sent its shareholders the allegedly misleading proxy statement from Texas to notify them that it would hold a special shareholder meeting in Texas, and the shareholders—many of them Texans—voted in Texas to approve the merger. There is no allegation that SP or Green did any banking business in Maryland, or had any plans to, or that any of the Directors or parties—including Appellants—had any business or residences in Maryland. There is no indication that Green

---

[19] Appellants' counsel conceded at oral argument that all conduct relevant to merger negotiations occurred outside of Maryland.

sought out SP because of its place of incorporation, nor any indication that Green, through its negotiations, sought to create a continuing obligation with the citizens of Maryland. *See CSR, Ltd.*, 411 at 463. Moreover, Appellants do not identify in the underlying direct shareholder class action any shareholders who were Maryland residents or that any alleged harm would be felt in this state.

As we stated earlier, this Court and the Court of Appeals have made clear that there is a difference between soliciting a transaction from a Maryland resident and actually soliciting a transaction in Maryland. *See, e.g.*, *Camelback II*, 312 Md. at 340; *Zavian*, 130 Md. App. at 701-02. During the negotiations, when the acts that form the basis of Appellants' complaint occurred (*before* Searchlight was formed and *before* the Articles of Merger were filed), Green had no contacts in Maryland, and we will not impute SP's incorporation in Maryland to Green. Equally, as in *CSR Ltd.*, Maryland was merely a conduit through which Green completed a transaction that was directed at and principally impacted another forum. *See* 411 Md. at 488-90. All of the merger negotiations and alleged breaches of fiduciary duties took place in Texas, and none were directed at residents in Maryland. Accordingly, we hold that Appellants failed to establish a nexus between Green's only true contact in Maryland—filing the articles for Searchlight, a transitory merger subsidiary with a Texas address—and Appellants' cause of action sufficient to satisfy Maryland's long-arm statute.[20]

---

[20] As the Court of Appeals explained in *CSR Ltd.*, once we have determined that the defendant's contacts with Maryland do not satisfy the "'purposeful availment' requirement, thus attaining sufficient minimum contacts with the State," we need not move

on to the third prong of the analysis to "consider whether the exercise of personal jurisdiction would be constitutionally reasonable[.]" 411 Md. at 493; *cf. Daimler*, 134 S. Ct. at 762 n.20 ("When a corporation is genuinely at home in the forum State, . . . any second-set inquiry would be superfluous."). Nevertheless, in this case, applying the fundamental fairness factors that the Supreme Court delineated to ensure that the exercise of jurisdiction comports with due process, *Burger King*, 471 U.S. at 477 (quoting *World-Wide Volkswagen*, 444 U.S. at 292), only bolsters our analysis under Maryland's long-arm statute against exercising personal jurisdiction over Green. *See Ellicott*, 995 Md. 479-80 (holding that Maryland's exercise of personal jurisdiction "would not comport with traditional notions of 'fair play and substantial justice[,]' in part, because litigating in Maryland would "impose a heavy burden" on the Australian defendant and witnesses who were located primarily in Australia, and because "[n]early all aspects of the contract took place in Australia and principally affected Australian interests" (citations omitted)).

The *first* factor (burden on the defendant) weighs heavily in Green's favor. Green— a Texas corporation that negotiated in Texas with SP's Directors, who resided in Texas, for the merger of SP's banks in Texas and Kentucky—had a legitimate interest in and expectation of not being haled into court in Maryland. *See Camelback II*, 312 Md. at 343. The *second* factor (Maryland's interest in the dispute) weighs weakly in Appellants' favor. Although Maryland has some interest in resolving disputes arising from the management and merger decisions of businesses incorporated in the state, the direct shareholder class action underlying this appeal is attenuated from Maryland and the impact of the merger will be felt in Texas, where both Green and SP are principally located and where nearly all of the merged banks operate. Additionally, this is not a derivative action in which the plaintiffs allege harm to the corporation itself; Appellants allege no harm in Maryland aside from asserting generally and without specific knowledge that SP, as a publicly-traded corporation, presumably has a shareholder who resides in Maryland and would qualify as a class member. The *third* factor (Appellants' interest in obtaining effective relief) also does not weigh in favor of Maryland exercising jurisdiction. Appellants have not alleged any personal connection to Maryland, nor have they indicated why litigating this dispute in Maryland would be more convenient or effective than if they did so in Texas. Finally, the *fourth* and *fifth* factors (the interstate judicial system's interest in effective relief and the states' shared interest in furthering substantive social policies) weighs against exercising jurisdiction in Maryland. Appellants' claims arose out of merger negotiations conducted in Texas by Texans concerning one Texas bank's acquisition of another bank's branches located principally in Texas. The witnesses and all of the relevant facts are located in Texas. The interstate judicial system is best served by resolving disputes in the forum more closely related to the cause of action. A contrary result would incentivize forum shopping—a practice that both Maryland and Texas consider to be inefficient and injurious to the interstate judicial system. *See, e.g.*, *Am. Motorists Ins. Co. v. ARTRA Grp., Inc.*, 338 Md. 560, 578 (1995); *In re AutoNation, Inc.*, 228 S.W.3d 663, 668 (Tex. 2007).

**SP Directors**

Appellants allege that the SP Directors are subject to personal jurisdiction in Maryland by virtue of their seat on the SP's Board of Directors and because they "caused" SP to file articles of merger in Maryland.

## A. SP Directors' Contacts as Directors of a Maryland Corporation

Appellants argue that the SP Directors are subject to specific jurisdiction in Maryland based on their acceptance of a directorship in a Maryland corporation. They urge us to adopt Delaware's approach, which, in response to the Supreme Court's decision in *Shaffer v. Heitner*, acted to permit jurisdiction based on a directorship alone.

The *Shaffer* Court addressed the constitutionality of a Delaware statute allowing a court of that state to take jurisdiction of a lawsuit by sequestering property in Delaware that belonged to the defendants. 433 U.S. at 186. As part of the case, the Court considered the issue of personal jurisdiction based solely on an individual's directorship in a Delaware corporation.

Heitner, a nonresident of Delaware, filed a shareholder derivative action in Delaware against Greyhound Corporation, a Delaware company with its principal place of business in Phoenix, Arizona; Greyhound Lines, Inc., its wholly owned, out-of-state subsidiary; and several of the company's officers and directors, none of whom were Delaware residents. 433 U.S. at 189-90. Heitner alleged that the officers and directors breached their duties to the company, causing Greyhound to engage in conduct that ultimately made the company liable for damages. *Id.* at 190. The activities that led to the imposition of damages took

49

place in Oregon. *Id.* The officers and directors asked the court to dismiss the suit against them, asserting that they lacked sufficient contacts with Delaware. *Id.* at 192-93. Heitner opposed their dismissal, arguing that "by accepting positions as officers or directors of a Delaware corporation," the defendants had accepted the substantial benefits the state provides to corporate officers and directors, and thereby subjected themselves to jurisdiction in Delaware. *Id.* at 215-16. The Supreme Court of Delaware affirmed the Court of Chancery's exercise of jurisdiction over the directors, determining that the proceeding was *quasi in rem* based on the presence in Delaware of the stock shares that the directors owned.[21] *Id.* at 193-95. The Supreme Court of the United States granted certiorari and reversed. *Id.* at 195.

After concluding that *quasi in rem* proceedings must be evaluated under the standards of *International Shoe*, just like *in personam* proceedings, the Court determined that the statutory presence of the directors' stock was unrelated to the cause of action and not grounds for jurisdiction. *Id.* at 212-13. The Court then considered whether the directors could be subject to personal jurisdiction based solely on their position on the board of a

---

[21] Pursuant to the statute in question, Heitner had filed a motion and accompanying affidavits together with his complaint, which resulted in an order sequestering approximately 82,000 shares of Greyhound common stock belonging to 19 of the defendants. *Shaffer*, 433 U.S. at 191-92. The defendants argued, among other things, that the ex parte sequestration procedure did not accord them due process of law, and that they did not have sufficient contacts in Delaware to sustain the jurisdiction of Delaware's courts. *Id.* at 193. Justice Marshall, writing for the majority, questioned the proposition established in *Pennoyer*, *supra,* that state-court jurisdiction could stand on the presence of property in the state alone, and concluded that "the time is ripe to consider whether the standard of fairness and substantial justice set forth in *International Shoe* should be held to govern actions in rem as well as in personam." *Id.* at 206.

Delaware corporation. *Id.* at 215-16. The appellants argued that Delaware had an interest in supervising the management of a Delaware corporation. *Id.* at 214. But the Court noted that under Delaware law, the exercise of jurisdiction was based on stock holdings, not board membership, demonstrating that the Delaware legislature had not displayed a strong interest in securing jurisdiction over corporate fiduciaries. *Id.* at 214-15. The Court reasoned that Delaware's failure to enact a jurisdictional statute that treated the acceptance of a directorship as consent to jurisdiction left the directors with "no reason to expect to be haled before a Delaware court." *Id.* at 216. For these reasons, the Court held that Delaware's assertion of jurisdiction based on an individual's corporate directorship violated the Due Process Clause. *Id.* at 216-17.

Just thirteen days after the Supreme Court issued its decision in *Shaffer*, the Delaware legislature responded directly. Del. Code Ann. Tit. 10 § 3114; *see Armstrong v. Pomerance*, 423 A.2d 174, 179 n.8 (Del. 1980); Verity Winship, *Jurisdiction Over Corporate Officers and the Incoherence of Implied Consent*, 2013 U. Ill. L. Rev. 1171, 1177 (2013). The State enacted new legislation notifying "[e]very nonresident of [Delaware] who . . . accepts election or appointment as a director, trustee or member of the governing body of a corporation organized under the laws of [Delaware]" that, in so doing, they were consenting to jurisdiction in Delaware in all actions against their corporation in which they are a necessary party and in all actions alleging a violation of duty to the corporation. Del. Code Ann. Tit. 10 § 3114; *Armstrong*, 423 A.2d at 175 n.1. Consequently, Delaware now asserts jurisdiction over the nonresident directors of Delaware corporations in actions based on an alleged breach of the directors' fiduciary

51

duties or where the corporation is a proper and necessary party. *Armstrong*, 423 A.2d at 176 n.5. The Court in *Armstrong* explained that the legislature authorized personal jurisdiction in these categories of cases because they are cases it deemed to be "inextricably bound up in Delaware law and where Delaware has a strong interest in providing a forum for redress of injuries inflicted upon or by a Delaware domiciliary, i.e., a Delaware corporation." *Id.* The Maryland General Assembly has not enacted a similar law.

Other state and federal courts considering the issue, in light of *Shaffer*, have held that these so-called "director consent" statutes are necessary to provide the directors with notice sufficient to permit the state's exercise of personal jurisdiction over them without running afoul of the Due Process Clause. *See, e.g.*, *Am. Freedom Train Found. v. Spurney*, 747 F.2d 1069, 1074-75 (1st Cir. 1984) (holding that nonresident directors lacked the requisite nexus to Massachusetts, in significant part, because "Massachusetts, unlike some states, has not enacted a statute that treats acceptance of a directorship as consent to jurisdiction in the state of incorporation" (citation omitted)); *Behm v. John Nuveen & Co.*, 555 N.W.2d 301, 306-07 (Minn. Ct. App. 1996) (ruling that "[a] state may assert jurisdiction over its corporate officers and directors by statute," but holding that because "Minnesota has no such statute . . . nonresident directors and officers cannot fairly be held to have consented to personal jurisdiction in Minnesota courts"); *Consipio Holding, BV v. Carlberg*, 282 P.2d 751, 756 (Nev. 2012) (distinguishing *Shaffer* based on a Nevada statute authorizing suit against corporate directors and "provid[ing] notice to officers and directors that they are subject to derivative suits for violation of their authority" (footnote omitted)).

Appellants point to the Fourth Circuit's decision in *Pittsburgh Terminal Corp. v.*

*Mid Allegheny Corp.*, 831 F.2d 522, 527-30 (4th Cir. 1987), which they insist distinguishes *Shaffer* and permits jurisdiction, without a director-consent statute, based on a foreign defendant's position on an in-state corporation's board of directors. In *Pittsburgh Terminal*, the Fourth Circuit considered whether a federal district court in West Virginia erred by dismissing an action for lack of personal jurisdiction against two nonresident corporate directors of a company incorporated and principally located in West Virginia. *Id.* at 524. Relying on Justice Brennan's partial dissent in *Shaffer*, the Court reasoned that West Virginia had a strong interest in resolving suits involving its corporate directors, despite the lack of a legislative statement to that effect. *Id.* at 528 & n.9 (citing *Shaffer*, 433 U.S. at 222 (Brennan, J., concurring and dissenting)). The Fourth Circuit ruled that a forum may exercise personal jurisdiction based on a corporate officer's acceptance of a directorship even without a director-consent statute because *Shaffer* did not require long-arm statutes to use "word[s] of art" such as "director" to bring nonresident directors within the state's jurisdiction. 831 F.2d at 527. The Fourth Circuit concluded that the term "transacting business" was a sufficient catchall. *Id.* & n.7; *but see Shaffer*, 433 U.S. at 216 ("[A]ppellants had no reason to expect to be haled before a Delaware court. Delaware, unlike some states,[22] has not enacted a statute *that treats acceptance of a directorship as consent to jurisdiction* in the State." (emphasis added; footnote omitted)).

---

[22] The Court in *Shaffer* cited to three states' director-consent statutes: Conn. Gen. State. Rev. §33-322 (1976); N.C. Gen. Stat. § 55-33 (1975); S.C. Code Ann. § 3-5-70 (1977).

To the extent *Pittsburgh Terminal* is persuasive authority, we note the case is distinguishable on the facts. The Fourth Circuit noted that the corporation at issue was not a "phantom" corporation (registered to do business in a state with no other presence or connection to that state) like the corporation at issue in *Shaffer* and like SP in the present case. *See* 831 F.2d at 528. Moreover, the directors were directors of a West Virginia corporation *that did business in West Virginia*, and approved the transaction through a telephone call to West Virginia. *Id*. at 524.

In Maryland, the Court of Appeals has made plain that a party's reasonable expectation of being haled into court is central in determining whether that court has personal jurisdiction over a party. *CSR*, *Ltd*., 411 Md. at 479-80; *Camelback II*, 312 Md. at 342-43. The Supreme Court stated clearly in *Shaffer* that Delaware's exercise of jurisdiction in that case violated due process because Delaware lacked a statute notifying the directors that that they consented to jurisdiction by accepting their positions as directors. 433 U.S. at 216 & n.47. Accordingly, we conclude that it would violate the due process rights of nonresident defendants to subject them to personal jurisdiction in Maryland based solely on their directorship in a company incorporated in Maryland. Without a director-consent statute, the out-of-state SP Directors had "no reason to expect to be haled before a [Maryland] court" when their only contact with Maryland was their directorship in a company that, although incorporated in Maryland, was headquartered in Texas and conducted all of its business outside Maryland. *See Shaffer*, 433 U.S. at 216. We believe that this result furthers the aim of the Due Process Clause by "giv[ing] a degree of predictability to the legal system that allows potential defendants to structure their

54

primary conduct with some minimum assurances as to where that conduct will and will not render them liable to suit." *World-Wide Volkswagen*, *supra*, 444 U.S. at 297.

## B. SP Directors' Forum Contacts in Causing the Merger

Appellants contend, however, that this is not a case in which jurisdiction would be predicated based solely on the defendants' acceptance of a directorship because the SP Directors personally availed themselves of Maryland law by causing the Articles of Merger to be filed in this state. Appellants argue that the SP Directors are subject to personal jurisdiction in Maryland based on their "clear and substantial" purposeful activity in the state—namely, merging two Maryland corporations in Maryland. This is consistent with Maryland law, according to Appellants, because Maryland does not require a defendant's physical presence in the state to permit the exercise of personal jurisdiction. The SP Directors respond that they are not subject to jurisdiction despite their seats on SP's board because all activities relevant to the underlying shareholder class action took place outside Maryland and none of the SP Directors have entered Maryland in connection with SP's business.

Appellants and the SP Directors refer us to the federal district court's decision in *Topik v. Catalyst Research Corp.*, 339 F. Supp. 1102, 1105-06 (D. Md. 1972) in support of their arguments. *Topik* was a shareholder derivative suit filed against the nonresident directors of a Maryland corporation following its merger with an out-of-state corporation. *Id.* at 1103-04. The individual directors in *Topik* were residents of Pennsylvania but attended annual board meetings in Maryland. *Id.* at 1104-05. In assessing Maryland's long-arm statute, the federal district court held that, because the decisions concerning the

merger were made in Pennsylvania, the "cause of action against the individual defendants d[id] not arise from their transacting any business in this state[.]" *Id.* at 1106. Similarly, the court held that jurisdiction could not exist based on tortious injury in the state because any acts or omissions in Maryland were committed by agents of the corporation itself and not agents of the individual directors. *Id.* (citing CJP § 6-103(b)(3)). The court instructed that "[i]t is the action of the individual defendants themselves in formulating a policy for the corporation to follow which forms the basis of the tort alleged and not the action of the corporation in following that policy. The corporate employees who acted in Maryland were agents of the corporation and not agents of the individual directors under these circumstances." *Id.* at 1106.

The court then turned to whether it could exercise jurisdiction over the directors by their causing tortious injury through acts committed outside of Maryland, as long as they had a sufficient nexus with Maryland based on the solicitation of business, receipt of substantial revenue from goods or services manufactured or consumed in Maryland, or any other persistent conduct in the state. *Id.* at 1106-07 (citing CJP § 6-103(b)(4)). The court held that, based on the directors' attendance at annual stockholder meetings and annual board of directors meetings in Maryland, the directors satisfied subsection (4) by establishing a persistent course of conduct in Maryland, even though they were not regularly doing business in the state. *Id.* at 1107-08. The court explained, "'Traditional notions of fair play and substantial justice' would seem to allow the stockholders of a corporation to sue the directors for breach of fiduciary duty in the home state of a corporation, *at least as long as the directors regularly come into that state to meet with*

*and to deal with the stockholders at annual meetings*." *Id.* at 1108 (emphasis supplied).

Insofar as the *Topik* court recognized that it could not exercise jurisdiction under the "transacting business" prong of the Maryland long-arm statute (CJP § 6-103(b)(1)), the case supports Appellees' position. Appellants must rely on the court's holding that the directors could be sued in Maryland for their alleged breaches of fiduciary duty outside Maryland under CJP § 6-103(b)(4) based on their regular attendance at directors' and stockholders' meetings in Maryland. There are several problems with Appellants' argument, starting with the fact that they do not rely on CJP § 6-103(b)(4) as conferring personal jurisdiction over the Directors in this case. Moreover, Appellants rely on SP's filing of the Articles of Merger in Maryland as the operative jurisdictional contact; yet, they do not allege that the Articles of Merger were fraudulent or even that they caused a tortious injury in Maryland. *See id.*; *see also Vitro*, 255 Md. at 506. Further, as *Topik* instructs, the allegation falls short as there is no indication that any of the SP Directors filed this instrument personally or did more than merely participate in SP's decision to merge with Green. *See* 339 F. Supp. at 1106.

The contacts that the *Topik* Court found determinative were the annual trips that the directors made into Maryland for shareholder meetings and directors meetings. *Id.* at 1107. The SP Directors in this case made no such visits to Maryland. Because Appellants have not alleged that the SP Directors personally and purposefully directed *any* contact toward Maryland with respect to the merger agreement, we need not delve into the due process analysis. *See CSR, Ltd.*, 411 Md. at 493.

We determine that the SP Directors—all nonresidents—who never entered Maryland

in connection with SP business, did not purposefully avail themselves of the privileges and protections of Maryland law by negotiating a merger in Texas with Green, a Texas corporation, or by sending its shareholders a proxy statement and notice of shareholder meeting from Texas, because all of the relevant activity occurred outside of Maryland. The only act that occurred in Maryland was SP's filing of the Articles of Merger in Maryland— an act, as we have explained, we will not impute to the corporation's directors for jurisdictional purposes under the facts presented. Thus, we hold the circuit court did not err in dismissing the SP Directors for want of personal jurisdiction.

## IV.

Our resolution of Appellants' first and second questions disposes of Appellants' contentions that SP and Searchlight were necessary parties under Maryland Rule 2-211(a), and that their complaint stated a claim for relief against each of the Appellees. Although the circuit court below acknowledged that it had personal jurisdiction over SP and Searchlight, Appellants' sole contention below and on appeal is that SP and Searchlight were necessary parties in the litigation of their claims against Green and the SP Directions. Having held that Appellants may not maintain their action in Maryland against Green and the SP Directors, there is no longer a cause of action to which SP and Searchlight are necessary parties. Although Appellants maintain that they stated a claim for relief against each of the Appellees—including SP and Searchlight—the 27 pages of briefing they dedicate to this issue refer to only the SP Directors and Green. In fact, Appellants concede that their "complaint does not specifically allege a claim against [SP and Searchlight]."

58

Therefore, we uphold the circuit court's decisions dismissing SP and Searchlight from the underlying action.

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**